OPINION OF THE COURT
Harold B. Beeler, J.
*671 This is a special proceeding brought pursuant to article 77 of the CPLR to determine the status of a cotrustee under an inter vivos trust, the Eleanor Spector Trust, created by the settlor Eleanor Spector on November 24, 2003. Petitioner Joel S. Sankel claims that upon the death of Eleanor Spector on January 29, 2004 he became her successor cotrustee of the trust, but that the trust’s other cotrustee, respondent Linda J. Spector, Eleanor Spector’s daughter, has refused to acknowledge his status as such.
Mr. Sankel has moved by order to show cause to compel Ms. Spector to turn over the books and records of the trust and to otherwise cooperate with him in connection with the management and administration of the trust. Ms. Spector opposes the application and cross-moves to dismiss the petition contending that Mr. Sankel unequivocally declined to accept the trusteeship at a social dinner party held approximately 10 days after her mother’s death, that Mr. Sankel did not have the power to revoke his disclaimer once exercised, and that, upon Mr. Sankel’s declination, Ms. Spector named her fiancé, A1 Jacobs, to serve as her cotrustee. Nominal respondent Barbara Berlin, a cobeneficiary under the trust with Ms. Spector, her sister, supports Mr. Sankel’s application.
Relevant Provisions of the Eleanor Spector Trust
The corpus of the trust consists of a 25% tenancy-in-common interest in two commercial real estate properties in Kings County. The remaining 75% interest in the two properties is owned by other members of Eleanor Spector’s family.
The trust instrument named Eleanor Spector and Ms. Spec-tor as the initial trustees. The designation of successor trustees is governed by paragraph 5.1 of the trust which provides as follows:
“Each acting Trustee and her or his respective successors may designate her or his successor by an acknowledged writing (either before or after the Trustee making the appointment ceases to act as Trustee) delivered to the other Trustee (s), if any, and the designation may be revoked in the same manner by the person making the designation, at any time before the successor qualifies. If Eleanor Spector or Linda J. Spector shall cease serving as Trustee without having appointed a successor, Joel Sankel shall act as co-Trustee in her place instead.” (Emphasis added.)
*672 Paragraph 5.2 of the trust authorizes the designation by an existing trustee of a successor trustee after all those previously designated have failed to qualify or ceased to act. It also provides for the appointment of an additional trustee. Paragraph 5.3 of the trust requires that all such trustee designations be by an acknowledged writing.
Resignation of an existing trustee is provided for in paragraph 5.5 of the trust, under which any trustee may resign by means of a written instrument duly acknowledged and delivered to the remaining trustees, if any.
Under paragraph 2.1 of the trust, the income from the trust’s interest in the two Kings County properties is distributed to the two designated beneficiaries, Ms. Spector and Ms. Berlin, equally during their joint lifetime and thereafter to the survivor of them. The trust also allows in paragraph 2.2 for any trustee, other than either of the settlor’s daughters, to distribute principal to either or both of the daughters in equal or unequal amounts.
Finally, paragraph 2.3 provides that, upon the death of the surviving respondent, the trust terminates and the remaining accrued interest and principal of the trust is to be distributed to Mark Pariser, the settlor’s grandson and son of Ms. Berlin.
Respective Contentions of the Parties
Mr. Sankel contends that pursuant to paragraph 5.1 of the trust he automatically became a cotrustee upon the death of Eleanor Spector inasmuch as she had not appointed a successor cotrustee before her demise, and that he remains cotrustee to this day because he never formally resigned the office by means of a written instrument duly acknowledged and delivered to the remaining trustee as required by paragraph 5.5 of the trust.
Ms. Spector argues that Eleanor Spector’s designation of Mr. Sankel as successor cotrustee in the absence of her having appointed a successor before her death as provided in paragraph 5.1 does not in and of itself confer successor cotrustee status on him and that a named cotrustee must first accept the office before being legally authorized to undertake its duties. Ms. Spector contends that Mr. Sankel orally refused to accept the trusteeship at a dinner on February 9, 2004 and that he lacks the legal authority to go back on his word and assume the co-trustee position. She claims further that upon Mr. Sankel’s disclaimer of the trusteeship, she designated Mr. Jacobs as her cotrustee pursuant to paragraphs 5.2 and 5.3 of the trust.
*673 Mr. Sankel responds that he never unequivocally told Ms. Spector and Mr. Jacobs at the February 9, 2004 dinner that he was declining to serve as cotrustee and that his actions subsequent to the dinner in undertaking the duties of a trustee confirm this. Therefore, even assuming a person designated as a trustee in a trust instrument cannot lawfully act as such unless he first accepts the appointment and that such person can orally renounce or decline his trusteeship, contentions with which Mr. Sankel vehemently disagrees, Mr. Sankel argues that he did, in fact, accept the trusteeship and that he has never disclaimed the office, orally or otherwise.
In order to resolve the conflicting factual contentions of the parties, the court ordered a hearing, held over two days, at which testimony was elicited from Mr. Sankel, Ms. Spector and Ms. Berlin, Mr. Jacobs and James Ledley, the attorney who drafted the trust.
Hearing Testimony
Designation of Mr, Sankel as Successor Trustee
The circumstances surrounding the creation of the trust as well as the events leading up to the February 9, 2004 dinner are largely not in dispute. The testimony at the hearing revealed that the settlor Eleanor Spector designated Mr. Sankel as successor cotrustee in the trust instrument at the suggestion of her daughter Ms. Spector because of the professional relationship and friendship between them. Mr. Sankel had served as Ms. Spector’s divorce attorney and, after the divorce, had helped her gain the skills necessary to reenter the work force. Mr. Sankel had also represented Eleanor Spector in litigation over the management of the Kings County properties which ultimately became the corpus of the trust.
After the trust instrument was created by Mr. Ledley, an attorney who specializes in trusts and estates for whom Ms. Spec-tor had worked as a paralegal, Mr. Sankel was asked to prepare the deeds to effectuate the transfer of legal title of Eleanor Spector’s 25% interest in the properties to the trust.
February 9, 2004 Dinner
Sometime shortly after Eleanor Spector’s death on January 29, 2004, Ms. Spector invited Mr. Sankel to have dinner with her and Mr. Jacobs. She wanted Mr. Sankel to meet Mr. Jacobs and to make some minor revisions in her will. A few days before the scheduled dinner, Ms. Spector decided to ask Mr. Sankel to decline the position of successor cotrustee in favor of Mr. Jacobs *674 who had agreed to serve in the event Mr. Sankel stepped aside. On the day of the dinner, Ms. Spector asked Mr. Ledley for advice as to what was required for Mr. Sankel to reject the successor trusteeship. He advised her that it was lawful for Mr. Sankel to orally decline to serve as cotrustee, but in that event it would be wiser to have Mr. Sankel confirm his intention not to serve in writing. Mr. Ledley further advised her that Mr. Sankel’s acceptance of the trusteeship required the formality of a writing.
That evening, Mr. Sankel, Ms. Spector and Mr. Jacobs dined together at Mr. Jacobs’s apartment. Afterward, Ms. Spector told Mr. Sankel that he had been named successor cotrustee under the trust and, as planned, asked him to decline the office and allow Mr. Jacobs to serve in his stead. All present at the dinner agreed that Mr. Sankel was surprised to hear of his designation, but their recollections differ on what followed. Mr. Sankel remembers telling Ms. Spector that he was sympathetic to her request, but that he needed to give the matter more thought before making a final decision. He testified as follows:
“It was a very pleasant evening. The first time I had met Mr. Jacobs. I liked him as a person. I was very happy for their relationship. After they told me that I was the co-trustee, Linda asked me to resign. The whole thing was kind of new to me and I was sympathetic to her request and said, all right, let me give it a little thought. And I asked for a copy of the trust agreement because I hadn’t seen it, I didn’t know what my powers were. I didn’t even know I was co-trustee.”
Ms. Spector and Mr. Jacobs both testified that Mr. Sankel, upon being asked not to serve as successor cotrustee, immediately and without any qualification agreed to step aside in favor of Mr. Jacobs. She testified as follows:
“I said Joel, my mother designated you as successor trustee of the trust... I said, you know, there have been problems within the family and litigation with nonfamily members . . . And A1 is going to be family. He and I are going to be married later in the year. And I would really like you to step aside and not accept the position and for A1 to be the second trustee. And, as he said ... he was really very pleased for me and pleased for both of us and said he didn’t have a problem with it. He didn’t hesitate. He didn’t skip a beat. He didn’t say he needed to *675 think about it. He didn’t say he needed to do anything other than his agreement in front of both of us not to serve.”
Mr. Jacobs remembered the conversation concerning Mr. Sankel’s declining the trusteeship as follows:
“She explained to him that he appeared in the trust documents. She asked him if he would decline to serve. He said sure. He certainly would. And Linda said that she was going to appoint me in his place, and I was pretty sure he said I’m very happy for you both, this is great, and I’m pleased you’re going to get married.”
Ms. Spector and Mr. Jacobs testified that after Mr. Sankel rejected the successor trusteeship, she asked him to fax her a written confirmation of his decision not to serve. However, according to Ms. Spector, Mr. Sankel never sent her such written confirmation despite his agreement to do so. Both Ms. Spector and Mr. Jacobs also testified that as soon as Mr. Sankel left, Ms. Spector asked Mr. Jacobs to serve as her cotrustee in light of Mr. Sankel’s declination and Mr. Jacobs reconfirmed his willingness to do so.
Mr. Sankel’s Version of Subsequent Events
On February 15, 2004, Mr. Sankel received by fax only a partial copy of the trust instrument that he had requested from Ms. Spector at the dinner. Missing from it were the provisions delineating the cotrustee’s powers. Mr. Sankel testified that a complete copy of the document had previously been sent to his law office on December 14, 2003 in conjunction with the deed transfer of the Kings County properties, but he was unaware of the availability of the complete document until after the instant petition was filed because an associate at his firm handled the real estate transaction.
Upon reading the partial copy of the trust instrument, Mr. Sankel became concerned about the provision (para 2.1) which authorized a cotrustee, other than a beneficiary, to invade the principal in favor of either beneficiary. Mr. Sankel had been wondering why Ms. Spector was not authorized by the trust to act alone as trustee without the assistance of a cotrustee. He now suspected that Ms. Spector asked him to resign in order to substitute Mr. Jacobs so that her fiancé might distribute the trust’s principal unequally to her and thereby disinherit her sister. Mr. Sankel sought the advice of several friends and again asked Ms. Spector to send him a complete copy of the trust instrument.
*676 He inquired of Mr. Ledley, the drafter of the trust, whether he remembered what Eleanor Spector’s intentions were in designating Mr. Sankel as successor cotrustee. Mr. Ledley had no recollection of Eleanor Spector’s motivation in that regard. Mr. Sankel reached Ms. Spector on March 2, 2004 after several telephone calls to her went unreturned. He advised her that he intended to continue to act as cotrustee, but that he would give further thought to the matter. He wanted to speak to Ms. Berlin before reaching a final decision on his status. Ms. Spector got rather angry with him and again asked him to resign. Mr. Jacobs got on the phone and became very angry, threatening to use the resources of his large law firm to remove Mr. Sankel as cotrustee.
A couple of weeks later, Mr. Sankel spoke by telephone with Ms. Berlin who resides in Canada. During this conversation, Ms. Berlin, whose relationship with her sister was distant and hostile, pleaded with Mr. Sankel to remain as cotrustee in order to protect her interests under the trust. Thereafter, on March 20, 2004, Mr. Sankel wrote a letter to Ms. Spector advising her that he will be proceeding as cotrustee and asking again for a full copy of the trust instrument. He expressed his utmost respect for Ms. Spector and asked her to put aside any feelings of animosity and forgo the threats of a lawsuit to remove him as cotrustee. On April 5, 2004, Mr. Sankel once more wrote to Ms. Spector asking again for cooperation and, in the event Ms. Spec-tor required a more formal acceptance than offered in the earlier letter and telephone conversations, Mr. Sankel enclosed a sworn formal written acceptance of the office of cotrustee.
Mr. Sankel asserted that he took additional steps to fulfill his duties as cotrustee. On April 5, 2004, he wrote to the managing agent of the trust’s properties advising that he was one of the cotrustees and requesting that he receive copies of all reports and correspondence relating to the properties. He enclosed a portion of the trust instrument to confirm his position as co-trustee entitling him to these records. On April 16, 2004, having received no response from the managing agent, he wrote back asking if the agent would be cooperating with him as co-trustee. In the time between these two letters from Mr. Sankel to the managing agent, Mr. Jacobs wrote a letter to the managing agent, dated April 14, 2004, a copy of which was received by Mr. Sankel, advising him to communicate only with Ms. Spector and to release no information concerning the trust to any other individual. Finally, on April 20, 2004, Mr. Sankel wrote to Ms. *677 Spector asking her to send him copies of the trust’s bank statements.
Mr. Sankel never received any responses to his letters to Ms. Spector. Nor did Ms. Spector ever provide him with either a complete copy of the trust instrument or any of the bank statements he had requested. Mr. Sankel also never received any information or documents from the properties’ managing agent nor was Mr. Sankel ever told that Mr. Jacobs had been designated by Ms. Spector to replace him as cotrustee.
Ms. Spector’s Version of Subsequent Events
On February 10, 2004, Ms. Spector called Mr. Ledley and informed him that Mr. Sankel had declined to serve as cotrustee the evening before. On February 12, 2004, Mr. Ledley sent Ms. Spector a document by which she would formally appoint Mr. Jacobs as her cotrustee and another document by which Mr. Jacobs would formally accept the appointment. The designation and acceptance documents were not, however, executed by Ms. Spector and Mr. Jacobs until February 27, 2004 because of an injury she suffered.
Approximately one week after the February 9, 2004 dinner, Ms. Spector telephoned Mr. Sankel because she had not received the fax confirming his declination of the appointment as co-trustee as promised at the dinner. On the telephone Mr. Sankel told Ms. Spector that he had been wondering what her mother’s intention was in naming him successor cotrustee and asked her to send him a copy of the trust instrument in order for him to ascertain her intent. Ms. Spector reminded him that he already had a copy of the trust instrument at his law office because he had prepared the deeds transferring title in the Kings County properties from Eleanor Spector individually to the trust. Nonetheless, Ms. Spector agreed to send him a partial copy of the trust instrument since Mr. Sankel was in Florida at the time. Mr. Sankel promised Ms. Spector that once he read the trust instrument he would fax her the promised declination.
In early March, Mr. Sankel telephoned Ms. Spector and asked again about her mother’s intent in naming him successor co-trustee. He indicated to Ms. Spector that he was thinking about changing his mind about serving as cotrustee. Ms. Spector told him he could not do that because he had already declined to serve and she had designated Mr. Jacobs as cotrustee who had accepted the position. At about this time, Ms. Spector opened a trust bank account for the purpose of distributing the income from the trust to herself and her sister. On March 27, 2004, Ms. *678 Spector sent Ms. Berlin her first income distribution from the trust. Three more income distributions have been made subsequently by Ms. Spector to herself and Ms. Berlin.
On or about April 5, 2004, Ms. Spector received Mr. Sankel’s statement that “I hereby accept the office of co-Trustee . . . and agree to commence acting as such successor co-Trustee.” Ms. Spector considers this document without legal significance since Mr. Sankel could not act as cotrustee as he had declined to accept the position and Mr. Jacobs had been appointed in his stead.
Legal Analysis and Findings
Mr. Sankel did not, as a matter of law, become cotrustee upon the death of Eleanor Spector even though she had not appointed a successor cotrustee before her demise. The creation of a trust is essentially a unilateral act. It is in the nature of an offer which must first be accepted by the designated trustee before the donative intent of the settlor is given effect. (See Bogert, Trusts and Trustees § 150, at 75 [2d rev ed 1979].) The law is clear that a named trustee must first accept the office of trustee before being legally authorized to undertake its duties. (Matter of Goldowitz, 145 Misc 300, 305 [Sur Ct 1932] [“It is fundamental that the mere naming of one as a trustee does not constitute him such until he accepts the appointment”]; In re Rivas’ Trust, 100 NYS2d 357, 360 [Sup Ct, Monroe County 1950] [“(T)he only logical conclusion to be drawn is that the trust instrument became effective upon the acceptance of the trust by the trustees, and the transfer to them as trustees of the securities set forth therein. They had no power to deal with the securities until that time . . . The trustees became vested with control and dominion over the securities when they accepted the trust”].)
Stated in another way, one named as a trustee in a trust instrument who has not accepted the fiduciary office cannot be compelled to act as such. (See Restatement [Third] of Trusts § 35.) Such person always has the option to either accept or reject the office in view of the serious responsibilities and liabilities attendant upon being named a trustee. (McCarthy v Poulsen, 173 Cal App 3d 1212, 1217, 219 Cal Rptr 375, 378 [Ct App, 3d Dist 1985] [there is “the personal liability a trustee would incur for tort liability arising during the administration of the trust”]; see also Bogert § 150, at 88 [“(s)ince (a) trust involves a relation requiring high good faith and much responsibility, it seems of doubtful expediency to indulge in presump *679 tions of acceptance where there is no affirmative conduct by the trustee”].)
Resignation by a trustee is distinguished, from an initial refusal by the trustee to accept the position. In order for the resignation provision of a trust instrument to come into play, the named trustee must first have accepted the trusteeship. Until acceptance has occurred no resignation is possible. (See Restatement [Third] of Trusts § 36.) While the resignation of an existing trustee usually requires a certain formality, such as a written instrument duly acknowledged described in paragraph 5.5 of the Eleanor Spector Trust, neither the initial acceptance of the trusteeship nor the refusal to accept the office requires any particular formality. (Restatement [Third] of Trusts § 35, Comment b [“No particular formalities are necessary for a designated trustee to manifest a refusal to accept the trusteeship. Similarly, unless otherwise provided by the terms of the trust, no particular formality is necessary to constitute an acceptance by the trustee of the fiduciary office. Thus, although trustees usually indicate acceptance by signing a trust agreement or other writing to that effect, an acceptance can be expressed orally or inferred from conduct”]; Dunning v Ocean Natl. Bank of City of N.Y., 61 NY 497, 502 [1875] [“a formal deed of disclaimer (of appointment as trustee) appears not to be regarded as necessary in the present condition of the law”].) Moreover, a designated trustee in an inter vivos trust who has unequivocally refused the trusteeship cannot thereafter accept the office without the consent of the settlor. (Restatement [Third] of Trusts § 35, Comment c; Matter of Estate of Slotkin, 191 NJ Super 486, 488, 467 A2d 803, 804 [1983].)
Whether a designated trustee has accepted the trusteeship or declined to serve turns on the facts of each case. In making such a determination a court must be guided by the well-settled principles of law that a trust is to be administered in a manner consistent with the intent of the settlor (Mercury Bay Boating Club v San Diego Yacht Club, 76 NY2d 256 [1990]); that neither a court nor a beneficiary of a trust has the power to substitute its discretion for that of the settlor (Maletta v Boczkowski, 93 AD2d 828 [2d Dept 1983]); and that the settlor’s intent is to be given effect unless contrary to law or public policy (Matter of Gilbert, 39 NY2d 663 [1976]).
Where, as here, the settlor Eleanor Spector intended that Mr. Sankel was to fill the cotrustee vacancy created by her death in the absence of her having previously designated another succes *680 sor and specifically so provided for that contingency in the trust instrument, such provision must be given effect unless the evidence strongly suggests an unwillingness on Mr. Sankel’s part to accept the trusteeship. (See Matter of Healy, 255 App Div 361 [4th Dept 1938].)
Turning to the evidence adduced at the hearing, the court finds credible the testimony of Ms. Spector and Mr. Jacobs that Mr. Sankel agreed at the February 9, 2004 dinner to decline the cotrusteeship in favor of Mr. Jacobs. However, the court concludes that such a statement should not automatically be binding on Mr. Sankel. In the case of testamentary trusts, there is a legislative requirement that any renunciation by a designated trustee be in writing and filed with the court. (SCPA 715.) While such a degree of formality is not statutorily required in the case of an inter vivos trust, the evidence manifesting a declination must, nonetheless, be unambiguous and leave no doubt as to the trustee’s intention. Thus, the few New York cases which have found a declination by a trustee without the execution of a formal written renunciation have relied on conduct which unequivocally points to a refusal to accept the trust. (Matter of Robinson, 37 NY 261 [1867] [named trustee who had not claimed the trusteeship for 20 years was rejected as trustee]; Dunning v Ocean Natl. Bank of City of N.Y., 61 NY 497 [1875] [10-year period of inaction by named trustee is proof of a refusal to accept the trust].)
Moreover, even an express disclaimer by a trustee may be vitiated or rebutted by conduct which demonstrates that he intends to accept the office. Where contemporaneous conduct by a named trustee is inconsistent as to whether he accepts or rejects his appointment, it is for the court to determine which choice should predominate under all of the circumstances. (Bogert § 150, at 84.) Mr. Sankel’s informal, well-intentioned declination, spontaneously uttered out of respect and friendship for Ms. Spector, and a desire to please her and Mr. Jacobs after learning of their engagement, should not foreclose an almost immediate change of heart, upon more considered reflection, where Mr. Sankel’s subsequent conduct is consistent with the acceptance of the trusteeship, where no person interested in the trust has been prejudiced thereby and where the other trustee has not as yet entered upon the performance of the trust.
Within days of the February 9, 2004 dinner, Ms. Spector was put on notice that Mr. Sankel was considering whether to accept or reject the trusteeship. As a cotrustee, she was under a *681 duty to await his final determination before engaging in any activity which would undermine the settlor’s intent in designating Mr. Sankel her successor cotrustee. In this regard, the court credits Mr. Sankel’s testimony that he did not realize or remember that a complete copy of the trust instrument had previously been faxed to his law office, and that he needed to review the trust before making his final decision on the trusteeship. The credible evidence further establishes that before Ms. Spector formally appointed Mr. Jacobs as cotrustee on February 27, 2004, she was aware of Mr. Sankel’s multiple requests to secure possession of a complete copy of the trust, actions which in and of themselves have been regarded as indicative of an intent to accept a trusteeship,* as well as his efforts to ascertain the settlor’s intent in designating him successor cotrustee. By the time of the first distribution of the trust’s income on March 27, 2004, which was Ms. Spector’s first significant undertaking with respect to the performance of the trust, she had already received Mr. Sankel’s letter advising her that he would be proceeding as cotrustee.
There is no merit to Ms. Spector’s contention that Mr. Sankel could not accept the trusteeship once having disclaimed it because the court finds there was no unequivocal disclaimer in the first place. Mr. Sankel engaged in a continuous course of conduct indicative of his willingness to undertake the responsibilities and burdens of the trusteeship, including his numerous efforts to gain Ms. Spector’s cooperation in the administration of the trust, his seeking out of Ms. Berlin in Canada to ascertain her concerns, and his requests to the managing agent of the trust property for all relevant records and correspondence, in addition to those mentioned above. It would indeed produce a harsh result violative of the settlor’s intent to allow an informal dinner party declination to outweigh such conscientious efforts which unequivocally reflect Mr. Sankel’s acceptance of the trusteeship.
Accordingly, for all of the aforesaid reasons, Mr. Sankel’s motion is in all respects granted and the cross motion to dismiss the petition is denied.
Wherefore, it is ordered that the petition is granted and the cross motion to dismiss the petition is denied; and it is further ordered that Ms. Spector is permanently enjoined from interfer *682 ing with Mr. Sankel’s ability to fulfill his fiduciary duties as co-trustee of the Eleanor Spector Trust; and it is further ordered that Ms. Spector cooperate with Mr. Sankel in the administration of the trust, including furnishing him with copies of all relevant reports, statements, tax returns and other pertinent writings; and it is further ordered that Ms. Spector instruct all persons dealing with the trust’s property to provide full cooperation to Mr. Sankel; and it is further ordered that Mr. Sankel be made a signatory on all bank, securities and other accounts maintained in the name of the trust; and it is further ordered that Mr. Sankel is permitted to retain Sankel, Skurman & Mc-Cartin LLP to perform services in connection with legal matters relating to the administration and management of the trust and that Sankel, Skurman & McCartin LLP’s fees and expenses be paid from the income of the trust as provided by law.

 Roberts v Moseley, 51 Mo 282, 285 (1873) (“The acceptance of the office of trustee may be proved by the declarations or other acts of the trustee”).