[819 NYS2d 520]

JOEL S. SANKEL, as Cotrustee of the Eleanor Spector Trust, Respondent, v LINDA J. SPECTOR, as Cotrustee of the Eleanor Spector Trust, Appellant, and BARBARA BERLIN, Respondent.

First Department, August 3, 2006

APPEARANCES OF COUNSEL

*Greenberg Traurig, LLP*, New York City (*Israel Rubin, Jeffrey R. Mann, James W. Perkins* and *Hilary J. Ames* of counsel), for appellant.

*Sankel, Skurman & McCartin, LLP*, New York City (*Claudio Dessberg* of counsel), for Joel S. Sankel, respondent.

*Berkman, Henoch, Peterson & Peddy, P.C.*, Garden City (*Joseph E. Macy* and *Andrew M. Roth* of counsel), for Barbara Berlin, respondent.

### OPINION OF THE COURT

NARDELLI, J.

In this appeal, we are asked to determine, inter alia, whether the informal renouncement of his appointment by a designated cotrustee of a certain inter vivos trust was sufficiently binding to preclude his subsequent acceptance of that appointment.

On November 23, 2003, Eleanor Spector created an inter vivos trust "to provide for her own needs and the future needs of her issue," respondent beneficiaries Linda Spector and Barbara Berlin. The trust provides that Eleanor and Linda are to be cotrustees and that upon Eleanor's death, Linda and Barbara were to receive equal monthly distributions from the trustees. Upon the death of either Linda or Barbara, the surviving beneficiary is to receive all of the income distribution. Barbara's son, Mark Pariser, is named as the remainderman and upon the death of the last remaining beneficiary, the trust would terminate and any accrued income, and the principal, would be distributed to Pariser. The corpus of the trust consisted of Eleanor's interest in the family's commercial real estate holdings at two locations in Brooklyn, New York.

Paragraph 5.1 of the trust provides:

"Each acting Trustee and her or his respective suc-

cessors may designate her or his successor by an acknowledged writing (either before or after the Trustee making the appointment ceases to act as Trustee) delivered to the other Trustee(s), if any, and the designation may be revoked in the same manner by the person making the designation, at any time before the successor qualifies. *If ELEANOR SPECTOR or LINDA J. SPECTOR shall cease serving as Trustee without having appointed a successor, JOEL SANKEL shall act as co-Trustee in her place and stead"* (emphasis added).

Also germane to this appeal is paragraph 2.2 of the trust, which states: "The Trustees *(other than either of the Settlor's daughters)* may at any time and from time to time distribute principal of the trust to either or both of LINDA or BARBARA, *equally or unequally"* (emphasis added).

It is undisputed that Barbara and Linda share an extraordinarily acrimonious relationship. Indeed, it is apparently so hostile that, to the extent that they do communicate with each other, it is only through their respective attorneys. Sankel, on the other hand, was known to Eleanor as he had performed some legal work for her on prior occasions and, apparently at Linda's suggestion, which was accepted by Eleanor, Sankel was delineated as a designated cotrustee. Linda maintained that Sankel was aware of the designation, whereas Sankel claims he was not.

On January 29, 2004, approximately two months after she created the trust, Eleanor died without having designated a successor trustee. Supreme Court conducted a hearing which began in July 2004 and culminated in September 2004, during which the following allegations were made concerning what transpired after Eleanor's death.

The parties agree that Linda invited Sankel to dinner at the apartment of her then fiancé and current husband, Albert Jacobs, on February 9, 2004, 11 days after her mother's death. Linda testified that while having dessert, she reminded Sankel that Eleanor had designated him successor trustee of the trust, of which Linda claimed Sankel was aware, and then requested that in view of "problems within the family and litigation with non-family members," and since Jacobs was going to "be family," she wanted Sankel to step aside and allow Jacobs to become the second trustee. Linda averred that Sankel readily agreed to step aside and was very pleased to hear about her engagement

to Jacobs. Jacobs's testimony echoed that of Linda, and he stated that "[Linda] asked [Sankel] if he would decline to serve. He said sure. He certainly would."

Sankel, in contrast, testified that when Linda asked him to withdraw, he was sympathetic to her request, but indicated that he wanted to give the matter some thought. Sankel further testified that he was unaware of his designation as a successor trustee, and that he asked Linda for a copy of the trust agreement because he had never seen it and did not know what powers were conferred on a cotrustee. Sankel stated that Linda faxed him a partial copy of the trust instrument on February 15, 2004, and that upon reviewing the portion of the document he received, he became concerned because the agreement permitted the nonbeneficiary trustee to make unequal distributions of the trust principal. Sankel speculated that Linda wanted to substitute her fiancé/soon-to-be husband Jacobs in his stead as the "independent" cotrustee in order effectively to disinherit Barbara and her son.

Sankel thereafter attempted to contact Linda several times, and also requested a full copy of the trust instrument on numerous occasions, but his calls and correspondence went unreturned until March 2, 2004, by which time Linda had Jacobs execute documents purportedly appointing Jacobs as the cotrustee. Sankel, during that phone call, informed Linda that he intended to continue to act as cotrustee, at least until he spoke to Barbara, at which juncture Linda became very angry and again asked him to resign. Jacobs then got on the phone and also became very angry, threatening to use the resources of his large law firm, if necessary, to remove Sankel as cotrustee. Sankel, approximately two weeks later, was finally able to contact Barbara in Canada, where she resides, at which time Barbara pleaded with Sankel to retain his position as cotrustee in order to protect her interests. Sankel, in an effort to fulfill his duties as cotrustee, then attempted to acquire bank statements and other documents concerning the trust corpus from Linda and the properties' managing agent, but all of his efforts were thwarted by Linda and Jacobs, or simply went unanswered. On April 5, 2004, Sankel executed an acceptance of the cotrusteeship and forwarded it to Linda that same day.

Sankel subsequently commenced this proceeding on June 3, 2004, pursuant to article 77 of the Civil Practice Law and Rules, by the service of an order to show cause and verified petition. The petition interposes two causes of action: the first cause of

action seeks a permanent injunction against Linda, enjoining her from interfering or preventing Sankel from carrying out his fiduciary duties as a cotrustee of the trust, and directing her to cooperate with Sankel in the management and administration of the trust; and the second cause of action seeks an order permitting Sankel to retain his former law firm to perform legal services pertaining to the trust's administration. Barbara submitted an affidavit (incorrectly denominated an affirmation) in support of Sankel's application, and Linda cross-moved to dismiss the petition.

Supreme Court, after conducting the aforementioned hearing, credited the testimony of Linda and Jacobs that Sankel initially agreed to decline the cotrusteeship at the February 9 dinner. The court found, however, that the statement was not automatically binding on Sankel and, in a thorough, well-reasoned decision, concluded, inter alia, that Sankel's

> "informal, well-intentioned declination, spontaneously uttered out of respect and friendship for Ms. Spector . . . should not foreclose an almost immediate change of heart, upon more considered reflection, where Mr. Sankel's subsequent conduct is consistent with the acceptance of the trusteeship, where no person interested in the trust has been prejudiced thereby and where the other trustee has not as yet entered upon the performance of the trust" (8 Misc 3d 670, 680 [2005]).

We agree and, accordingly, affirm.

Our analysis begins with the well-settled proposition that the court, in determining the intent of a grantor of an inter vivos trust, must look to the words used in the trust instrument and, once it is determined, must effectuate that intent unless it is contrary to public policy or the law (*Mercury Bay Boating Club v San Diego Yacht Club*, 76 NY2d 256, 267 [1990]; *Matter of Gilbert*, 39 NY2d 663, 666 [1976]; *see also Maletta v Boczkowski*, 93 AD2d 828, 829 [1983] [the intent of the settlor is of controlling importance and neither the court, nor a beneficiary, nor the Legislature, is competent to violate that intent and substitute its own discretion for that of the settlor]).

Moreover, it is also a firmly established principle of trust law that a trustee owes a duty of undivided loyalty to the trust, which standard "does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. Undivided loyalty is the supreme

test, unlimited and unconfirmed by the bounds of classified transactions" (*City Bank Farmers Trust Co. v Cannon*, 291 NY 125, 131 [1943]; *see also Pyle v Pyle*, 137 App Div 568, 572 [1910], *affd* 199 NY 538 [1910] [a trustee "owes an undivided duty to his beneficiary, and he must not, under any circumstances, place himself in a position whereby his personal interest will come in conflict with the interest of his *cestui que trust*"]; *Matter of Hall*, 275 AD2d 979, 980 [2000] ["(i)f the personal interests of a trustee conflict with her interest as a trustee, the court may remove her as a trustee"]). This inflexible duty of loyalty prohibits a trustee from even placing himself in a position of potential conflict with his or her duty to the trust (*Matter of Rothko*, 43 NY2d 305, 319 [1977]; *see also Birnbaum v Birnbaum*, 73 NY2d 461, 466 [1989] ["(t)his is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty"]; 106 NY Jur 2d, Trusts § 347 ["The standard of loyalty in trust relations does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. The purpose sought to be secured by this rule is to require a trustee to assume a position where his every act is above suspicion, and the trust estate, and it alone, can receive, not only his best services, but also his unbiased and uninfluenced judgment"]).

In this matter, the intent of the settlor can be readily gleaned from the document, not only from Eleanor's designation of Sankel, a person whom she obviously trusted, to succeed her, but also by the specific limitation, set forth in the trust instrument, that only an independent trustee, i.e., neither Barbara, nor Linda, may invade the principal and distribute it "equally or unequally." We can perceive of no view of Jacobs's appointment, nor are we presented with one, that would honor Eleanor's intent, or fulfill the obligation of a trustee to avoid placing himself in a position where not even the appearance of a conflict with his duty to the trust should exist. Indeed, Linda's rush to have her fiancé appointed as a trustee also is disquieting.

Linda's primary argument on appeal, however, is that Sankel's oral declination of the trusteeship is fully binding and cannot be reversed, or as her reply brief trumpets, "No Means No," and that Jacobs is the duly appointed cotrustee.

This matter, without doubt, presents a unique factual scenario. Moreover, there is no bright line rule, or formal methodol-

ogy, by which the designated trustee of an inter vivos trust may accept or renounce that trusteeship. Initially, we note that an individual designated as a trustee cannot be compelled to act as such, or accept the burdens of the position against his or her will, and the designee is not qualified to act until he accepts the designation (*see Matter of Goldowitz*, 145 Misc 300, 305 [1932]; *In re Rivas' Trust*, 100 NYS2d 357, 360 [1950]; Bogert, Trusts and Trustees § 150, at 78 [2d ed rev]; 106 NY Jur 2d, Trusts § 248). The acceptance of the position, or its renunciation, may be manifested in an abundance of ways, and can be expressed either orally or inferred from conduct (Restatement [Third] of Trusts § 35, Comment *b*; Bogert § 150, at 81-82).

In the case of an inter vivos trust, it has been held that once the designated trustee *has unequivocally* declined the office, he or she cannot thereafter accept it (*see Matter of Estate of Slotkin*, 191 NJ Super 486, 467 A2d 803 [1983] [in which the designated cotrustee unequivocally, and formally, in court, renounced her appointment as cotrustee, only to seek to repudiate the renouncement once the court declined to appoint the individual she chose in her stead]), and that a trusteeship may likewise be renounced through the designated trustee's own inaction (*see Dunning v Ocean Natl. Bank of City of N.Y.*, 61 NY 497 [1875] [10-year period of dormancy by designated trustee established his refusal to accept the position]; *Matter of Robinson*, 37 NY 261, 263 [1867] ["(h)is omission to qualify as trustee or to claim the trusteeship for (20 years), and permitting other persons during all that time to perform the duties without challenge, must be deemed a renunciation and refusal on his part to accept the trust"]).

It has also been observed, however, that "[a]n express disclaimer of the trust may be vitiated or rebutted by conduct of the trustee which shows [the trustee] really meant to accept. Where simultaneous conduct is somewhat inconsistent, the problem will be whether the predominant effect is acquiescence or rejection" (Bogert § 150, at 84; *accord* Restatement [Third] of Trusts § 35, Comment *b* ["(i)t is a question of fact in each case whether the trustee has manifested an intention to accept or to reject the trusteeship"]; 2 Scott and Ascher on Trusts § 11.5.3 [5th ed] ["(i)n the case of an inter vivos trust, a trustee who has disclaimed cannot thereafter accept, unless . . . the court decides otherwise"]).

In the matter before us, we find no reason to disturb the hearing court's conclusion that Sankel never unequivocally

disclaimed the trusteeship, especially in light of his almost immediate change of heart after the ramifications of his renunciation became apparent to him; his multiple, and frustrated, attempts to secure a copy of the trust instrument from Linda; his efforts, and finally his success, in contacting Barbara, the cobeneficiary, in Canada, and, in the process, ascertaining her vigorous desire that he accept the position to protect her interests; and his numerous attempts to obtain the books, records and other relevant documentation concerning the trust property from the managing agent, all of which indicate Sankel's intention to accept the designation of cotrustee and its concomitant burdens and responsibilities (*see* Bogert § 150, at 81-82).

Moreover, we must bear in mind that our overriding concern in this matter is the implementation of the intent of the settlor, Eleanor, who designated Sankel as her successor, and as the only trustee who could invade the principal of the trust "equally or unequally," in favor of either beneficiary. Clearly, the appointment of Jacobs does nothing to further Eleanor's interest, and would be in direct contravention of the wishes of Linda's cobeneficiary. In addition, none of the beneficiaries of the trust will be prejudiced in any manner by Sankel's assumption of the cotrusteeship. Accordingly, with a view to all of the foregoing circumstances, we find that Sankel unequivocally accepted the cotrusteeship.

Finally, we observe no obstacles to the retention of Sankel's former law firm as attorneys for the trust, and find Linda's claims of a "conflict" to be, at best, disingenuous, as she apparently finds no issue with the employment by the trust of her husband's *current* firm.

Accordingly, the judgment (denominated an order) of the Supreme Court, New York County (Harold Beeler, J.), entered on or about April 8, 2005, which granted Joel Sankel's petition and, inter alia, enjoined Linda Spector from interfering with his ability to fulfill his fiduciary duties as a cotrustee of the Eleanor Spector Trust, directed that the firm of Sankel, Skurman & McCartin could be retained by the trust for legal matters, and denied Ms. Spector's cross motion to dismiss the petition, should be affirmed, without costs.

Buckley, P.J., Sullivan and McGuire, JJ., concur.

Judgment (denominated an order), Supreme Court, New York County, entered on or about April 8, 2005, affirmed, without costs.