OPINION OF THE COURT
Alexander, J.
On September 7 and 9, 1988, in the waters off San Diego, California, Mercury Bay Boating Club Inc.’s challenger vessel, the New Zealand, a monohull-keel yacht, was defeated two races to none by San Diego Yacht Club’s defending twin-hulled catamaran, the Stars and Stripes, in the 27th America’s Cup match. Contending that San Diego’s defense of the Cup by sailing an inherently faster multihull catamaran against a larger, but slower monohull yacht was unsportsmanlike, antithetical to the concept of "friendly competition between foreign countries” and a "gross mismatch” in violation of the America’s Cup Deed of Gift and San Diego’s obligations *260 as trustee, Mercury Bay obtained a judgment in New York Supreme Court disqualifying San Diego’s catamaran, declaring the New Zealand to be the winner of the two races and directing that San Diego transfer the America’s Cup to Mercury Bay.
 A divided Appellate Division reversed, declared the Stars and Stripes to be an eligible vessel and the winner of the two races, and therefore that San Diego was the rightful holder of the America’s Cup. We agree that the Stars and Stripes was an eligible vessel under the terms of the Deed of Gift and that San Diego breached no fiduciary duty in racing a catamaran against Mercury Bay’s challenging yacht. Accordingly, we affirm.
I
The America’s Cup, a silver cup trophy, is the corpus of a charitable trust created in the 19th century under the laws of New York. So called because it was won by the yacht America in a race around the Isle of Wight in 1851, the America’s Cup was donated by its six owners to the New York Yacht Club in 1857. The Cup was twice returned to George Schuyler, the sole surviving donor, when questions arose as to the terms of the trust in which the Cup was to be held. Schuyler executed the present Deed of Gift in 1887, donating the Cup to the New York Yacht Club, to be held in trust "upon the condition that it shall be preserved as a perpetual Challenge Cup for the friendly competition between foreign countries”.
Pursuant to the Deed of Gift, the holder of the Cup is its sole trustee and is to be succeeded by a competitor who successfully challenges the trustee in a race for the Cup. Unless otherwise agreed by the parties, the terms of the challenge are specified in the deed. The relevant provisions of the deed provide:
"This Cup is donated upon the condition that it shall be preserved as a perpetual Challenge Cup for friendly competition between foreign countries.
"Any organized Yacht Club of a foreign country * * * shall always be entitled to the right of sailing a match for this Cup, with a yacht or vessel propelled by sails only and constructed in the country to which the Challenging Club belongs, against any one yacht or vessel constructed in the country of the Club holding the Cup.
"The competing yachts or vessels, if of one mast, shall be *261 not less that forty-four feet nor more than ninety feet on the load water-line; if of more than one mast they shall be not less than eighty feet nor more than one hundred and fifteen feet on the load water-line.
"The Challenging Club shall give ten months’ notice, in writing, naming the days for the proposed races * * * Accompanying the ten months’ notice of challenge there must be sent the name of the owner and a certificate of the name, rig, and following dimensions of the challenging vessel, namely, length on load water-line; beam at load water-line and extreme beam; and draught of water, which dimensions shall not be exceeded; and a custom-house registry of the vessel must also be sent as soon as possible. Centre-board or sliding keel vessels shall always be allowed to compete in any race for the Cup, and no restriction nor limitation whatever shall be placed upon the use of such centre-board or sliding keel, nor shall the centre-board or sliding keel be considered a part of the vessel for any purposes of measurement.
"The Club challenging for the Cup and the Club holding the same may, by mutual consent, make any arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all other conditions of the match, in which case the ten months’ notice may be waived.
"In case the parties cannot mutually agree upon the terms of a match, then three races shall be sailed, and the winner of two of such races shall be entitled to the Cup. All such races shall be on ocean courses * * * [These ocean courses] shall be selected by the Club holding the Cup; and these races shall be sailed subject to its rules and sailing regulations so far as the same do not conflict with the provisions of this deed of gift, but without any time allowances whatever. The challenged Club shall not be required to name its representative vessel until at a time agreed upon for the start, but the vessel when named must compete in all the races, and each of such races must be completed within seven hours.”
Although the defending club, as holder of the Cup, is its trustee, it is nevertheless required to compete with challengers for the Cup. Nothing in the deed limits the design of the defending club’s vessel other than the length on water-line limits applicable to all competing vessels, nor are the competing vessels expressly limited to monohulls. Moreover, there is no requirement that the defending vessel have the same *262 number of hulls as. the challenging vessel, or even that the competing vessels be substantially similar.
Prior to 1988, the America’s Cup competitions generally were conducted under the mutual consent provisions of the deed, with the contestants agreeing upon the date, time and length of the races and, beginning in 1930, even upon the choice of vessels to be raced. Although multihull vessels were in use at the time the deed was executed in 1887 and during all the ensuing years, none ever competed for the America’s Cup prior to the match at issue here. Between 1930 and 1937, the agreed-upon vessels were large ocean-going vessels known as J-boats, which subsequently became too expensive to build and maintain. Consequently, the yachting community lost interest in the America’s Cup competition and the New York Yacht Club, which had successfully defended the Cup 16 times before 1937, received no challenges for a 20-year period thereafter. Attempting to revive interest in the competition, in 1956 the New York Yacht Club obtained a court order amending the Deed of Gift to reduce the minimum load water-line length to its present 44 feet and to eliminate the requirement that the challenging vessel sail to the match "on its own bottom”, a requirement that had disadvantaged foreign challengers. These amendments allowed the competition to be conducted in yachts of the international 12-meter class, which measure 44 feet on the load waterline. Thereafter, in response to the increased interest in the competition by many challengers and with the consent of those challengers, the New York Yacht Club instituted an elimination series, conducted in these 12-meter yachts, in which the winner of the series was entitled to sail a match against the defender of the Cup.
The America’s Cup races were conducted in these elimination series at 3-to-4-year intervals for a period of 30 years, with the New York Yacht Club retaining the Cup until 1983 when it lost to the Royal Perth Yacht Club of Australia. Three years later, 13 yacht clubs representing six nations competed to determine which would challenge Royal Perth for the Cup. In the finals, Stars & Stripes 87 of the San Diego Yacht Club defeated Royal Perth’s defender Kookaburra III four races to none.
San Diego planned to defend the Cup in 1990 or 1991 in a 12-meter yacht, adhering to the traditional multiple challenger format. In 1987, as yacht clubs all over the world prepared to compete in that event, Mercury Bay issued a *263 notice of challenge to San Diego, which for the first time in 30 years, deviated from the multiple challenger format as well as the tradition of holding the races in 3-to-4-year intervals. Mercury Bay demanded a match in less than a year and disclosed that it would race a yacht measuring 90 feet on the load waterline, the maximum length permitted in the deed and a size yacht that had not been built in 50 years. As most foreign yacht clubs were already preparing for a race of 12-meter yachts, they would have been unable to compete on the terms demanded by Mercury Bay; indeed, of the 19 bids received by San Diego, Mercury Bay’s was the only challenge which deviated from the traditional format. To justify its unorthodox challenge, Mercury Bay advised San Diego that it sought to compete in a vessel larger than those of recent matches because such a yacht, by "utilizing technology outside any class or rating rule would be most likely to offer real opportunity of innovative design to the benefit of yachting at large”.
San Diego announced that the terms of the challenge were unacceptable under the Deed of Gift and notified other challengers that the next match would be held in 1990 or 1991 in 12-meter yachts. Mercury Bay commenced an action in New York Supreme Court seeking a declaration of the validity of its challenge, and a preliminary injunction prohibiting San Diego from considering any other challenges until Mercury Bay’s challenge was decided.
In its capacity as trustee of the America’s Cup, San Diego commenced an action pursuant to EPTL 8-1.1 (c) (1), seeking interpretation or amendment of the Deed of Gift to authorize a continuation of the traditional 12-meter yacht elimination series format employed by both the New York Yacht Club and the Royal Perth Yacht Club, the only two prior trustees. The Attorney-General of the State of New York, which represents the beneficiaries of charitable trusts under EPTL 8-1.1 (f), supported San Diego’s position in both actions.
Supreme Court rejected San Diego’s application to interpret or amend the Deed of Gift and granted Mercury Bay’s motion for a preliminary injunction, declaring the notice of challenge valid. The court held that San Diego’s options were to "accept the challenge, forfeit the Cup, or negotiate agreeable terms with the challenger”.
Although the parties thereafter made several proposals in an attempt to negotiate agreeable terms, they were unsuccess *264 ful, and San Diego proceeded with preparations for its defense of the Cup. In late January 1988, San Diego announced its decision to race in a catamaran whose dimensions, although smaller than Mercury Bay’s monohull yacht, fell within the limitations expressed in the Deed of Gift.
Mercury Bay moved to hold San Diego in contempt of Supreme Court’s prior order validating Mercury Bay’s challenge, arguing that the use of a catamaran, a type of vessel never before raced in an America’s Cup match, would deny it the "match” to which it was entitled under the deed because the catamaran is, by design, inherently faster than a mono-hull vessel. According to Mercury Bay, the deed required the defending club to race a vessel which was "like or similar” to the challenging vessel. Supreme Court denied the motion and directed the parties to reserve their protests until after completion of the America’s Cup races. As indicated, the match was held on September 7 and 9, 1988 and San Diego defeated Mercury Bay two races to none.
San Diego had little time to celebrate before it found itself back in court. Mercury Bay moved to have the results of the race set aside, have itself declared the winner and for an order directing that the Cup be awarded to it. Concluding that the deed implicitly required the America’s Cup race to be held only between vessels which were "somewhat evenly matched” and that San Diego’s use of á catamaran constituted an attempt to "retain the Cup at all costs so that it could host a competition on its own terms” which violated the spirit of the deed, Supreme Court disqualified San Diego’s catamaran, declared Mercury Bay the winner of the two races and directed San Diego to transfer the America’s Cup to Mercury Bay.
In reversing Supreme Court, the Appellate Division concluded that the Deed of Gift unambiguously permitted matches between "yacht[s] or vessel[s]” meeting the length specifications articulated within the deed, that San Diego’s catamaran was an eligible vessel, and therefore that San Diego is the rightful holder of the America’s Cup. Mercury Bay appeals by leave of the Appellate Division.
II
Mercury Bay asks us to set aside the results of the 1988 America’s Cup match because, in its view, San Diego’s defense of the Cup in a catamaran violated the spirit of the Deed of *265 Gift as exemplified both by its terms and various items of extrinsic evidence. It argues that the donors of the Cup never intended to permit such a catamaran defense because a race between a catamaran and a monohull yacht is an inherently unfair "mismatch” which the monohull yacht has no chance of winning. Instead, Mercury Bay contends that the donors intended to restrict the defender’s choice of vessel to the type selected by the challenger and to require further that the particular vessel used afford the challenger a chance of winning the match. Mercury Bay also argues that by sailing a catamaran to defend the Cup, San Diego breached its fiduciary duties as trustee under the Deed of Gift.
Although these arguments are clothed in the legal rubric of interpreting the "intent” of the drafters of the trust instrument and determining the fiduciary duties owed by the trustee, the gravamen of Mercury Bay’s complaint is that such a race between a multihull catamaran and a monohull yacht is inherently "unfair”, whether or not the donors intended to permit it. The measure of "fairness” in this regard, according to Mercury Bay and the dissenters, are standards of sportsmanship as determined by reference to practices which are presently the custom in sporting activities generally and yacht racing in particular.
The question of whether particular conduct is "sporting” or "fair” in the context of a particular sporting event, however, is wholly distinct from the question of whether it is legal. Questions of sportsmanship and fairness with respect to sporting contests depend largely upon the rules of the particular sport and the expertise of those knowledgeable in that sport; they are not questions suitable for judicial resolution (see, e.g., Crouch v National Assn. For Stock Car Auto Racing, 845 F2d 397, 403; Finley & Co. v Kuhn, 569 F2d 527, 539). As sporting activities evolve in light of changing preferences and technologies, it would be most inappropriate and counterproductive for the courts to attempt to fix the rules and standards of competition of any particular sport. To do so would likely result in many sporting contests being decided, not in the arena of the sport, but in the courts.
Moreover, the Deed of Gift governing the conduct of the America’s Cup competitions contemplates that such issues of fairness and sportsmanship be resolved by members of the yachting community rather than by the courts. The deed provides that where the defending and the challenging yacht *266 clubs have not agreed upon the terms of the match, it is to be conducted as specified in the deed and pursuant to the rules and regulations of the defending club, so long as they do not conflict with the deed. As the deed broadly defines the vessels eligible to compete in the match, it is these rules and regulations which the donors intended to govern disputes relating to racing protocol such as the fairness of the vessels to be used in a particular match.[1]
In this case, the dispute over the eligibility of the chosen vessels should have been governed and determined by the rules of yacht racing promulgated by the International Yacht Racing Union (IYRU) and followed by the defending San Diego Yacht Club. Pursuant to these rules, an international jury referees the match and decides all protests jointly submitted to it by the parties. The international jury established to resolve all disputes arising out of the 1988 America’s Cup match was composed of five members, all IYRU-certified racing Judges of vast experience and international repute, from countries other than the United States and New Zealand. Despite Mercury Bay’s repeated claims of the unfairness of San Diego’s catamaran defense and notwithstanding San Diego’s request that a protest be submitted to the international jury, Mercury Bay deliberately chose to keep the issue from these yachting experts, who were of course, best suited to resolve it. Having thus chosen to seek relief in a judicial forum, Mercury Bay is limited to a resolution of only the legal issues presented.
A
The legal issue we must determine is whether the donors of the America’s Cup, as the settlors of the trust in which it is held, intended to exclude catamarans or otherwise restrict the *267 defender’s choice of vessel by the vessel selected by the challenger. Long-settled rules of construction preclude an attempt to divine a settlor’s intention by looking first to extrinsic evidence (New York Life Ins. & Trust Co. v Hoyt, 161 NY 1, 8-10). Rather, the trust instrument is to be construed as written and the settlor’s intention determined solely from the unambiguous language of the instrument itself (Central Union Trust Co. v Trimble, 255 NY 88, 93; Loch Sheldrake Assocs. v Evans, 306 NY 297, 304; Gross v Cizauskas, 53 AD2d 969, 970). It is only where the court determines the words of the trust instrument to be ambiguous that it may properly resort to extrinsic evidence (New York Life Ins. & Trust Co. v Hoyt, supra; Gross v Cizauskas, 53 AD2d, at 970, supra; 2A Scott, Trusts § 164.1, at 253-254 [Fratcher 4th ed]). The rationale underlying this basic rule of construction is that the words used in the instrument itself are the best evidence of the intention of the drafter of the document. Therefore, we must examine the plain language of the Deed of Gift at issue here.
Contrary to Mercury Bay’s contentions, nowhere in the Deed of Gift have the donors expressed an intention to prohibit the use of multihull vessels or to require the defender of the Cup to race a vessel of the same type as the vessel to be used by the challenger. In fact, the unambiguous language of the deed is to the contrary. The deed accords a foreign yacht club "the right of sailing a match for [the America’s] Cup, with a yacht or vessel propelled by sails only and constructed in the country to which the Challenging Club belongs, against any one yacht or vessel constructed in the country of the Club holding the Cup” (emphasis added). Given its plain and natural meaning, the phrase "any one yacht or vessel” requires the defender to defend in a single vessel of any type. If, as the dissenters argue, the term "any” was intended to mean "one”, in the sense of limiting the defender to a defense in a single vessel (dissenting opn, at 286), the term would be redundant, since the very next word in the phrase so limits the defense to "one” vessel. By limiting the defense to a single vessel, the deed ensures a "match” which will be a one-on-one competition. In this match, however, the deed expressly permits a defense by any type of yacht or vessel, and restricts the actual vessels to be used only by the length on load water-line restrictions applicable to all "competing vessels”, the latter phrase again making clear the donors’ intention to leave both the defender’s and the challenger’s choice of vessel otherwise unrestricted.
*268 Notwithstanding the broad language of the deed, Mercury Bay argues that the donors could not have intended to permit a catamaran defense because the dimensions which the deed requires the challenger to disclose are relevant to monohull but not multihull vessels. This argument misapprehends the role of the dimensions in the competitions contemplated by the deed. Because the deed allows a challenge to be mounted upon 10 months’ notice, the defender of the Cup is allowed only this short time to construct a defending vessel although the challenger has had unlimited time to mount a challenge and thus may have taken years designing and constructing its challenging vessel. By requiring the challenger to disclose certain dimensions with its 10-month notice, the deed provides the defender with notice of the vessel it will be facing and thus removes the competitive advantage which would otherwise inure to the challenger. For the same reason, the deed does not require the defender to disclose any details about its vessel until the start of the race. Thus, the challenger’s disclosed dimensions, which may not be exceeded, limit only the challenging vessel, and do not restrict the defending vessel. So understood, the question of whether the dimensions themselves relate to multihull vessels is simply not relevant to the issue of whether the deed precludes a catamaran defense.
In this case, we are not presented with the issue to which Mercury Bay’s arguments are relevant — whether the required dimensions preclude the use of a catamaran by a challenger because the dimensions specified do not relate to multihull vessels and therefore do not provide the defender with the disclosure mandated by the deed. While we have no occasion to address this question, we note that the applicability of the required dimensions to multihull vessels is hotly contested by the parties before us, both of whom have submitted expert evidence supporting their respective positions.
We also reject Mercury Bay’s contention that the phrase "friendly competition between foreign countries” connotes a requirement that the defender race a vessel which is of the same type or even substantially similar to the challenging vessel described in the 10-month notice. Neither the words themselves nor their position in the deed warrant that construction. Although the stated purpose of the Deed of Gift is to foster "the friendly competition between foreign countries”, that general phrase does not delineate any of the specific requirements of the matches to be held. Moreover, while each *269 match is a competition, the deed permits the competitors to both construct and race the fastest vessels possible so long as they fall within the broad criteria of the deed. Thus the defender does not become a competitor only when "the first warning gun of the race goes off” (dissenting opn, at 279); the deed makes clear that the design and construction of the yachts as well as the races, are part of the competition contemplated. Mercury Bay’s suggestion, argued explicitly below and implicit here, that the vessels must be evenly matched is belied by its own assertion that the deed permits a match between a 44-foot monohull and a 90-foot monohull— two vessels which, although within the load water-line length restrictions in the deed and of the same type, cannot be said to be "evenly matched” given the much greater speed potential of the larger boat. Indeed, such a requirement that the vessels be "evenly matched” is antithetical to the consent provisions of the deed. There is no point in permitting a defender to give or withhold its consent on the terms of the matches if by simply making a challenge, the challenger could force the defender to accede to its terms. As the Appellate Division majority noted, the donors, who chose to be specific about other aspects of the match, including the load waterline lengths of the competing vessels, could have easily included an express requirement that the vessels be evenly matched but did not do so.
In our view, the phrase "friendly competition between foreign countries” more aptly refers to the spirit of cooperation underlying the competitions contemplated by the deed. The matches were to be between yacht clubs of different countries, and the deed contemplated that they would cooperate as to the details of the matches to be held. It was in this spirit of cooperation that the competitors had, since 1958, agreed to race in 44-foot yachts. Indeed, it was Mercury Bay, not San Diego, that departed the agreed-upon conditions of the previous 30 years. San Diego responded to Mercury Bay’s competitive strategy by availing itself of the competitive opportunity afforded by the broad specifications in the deed.
Accordingly, we conclude that the unambiguous language of the Deed of Gift, permitting the defending club to defend the Cup in "any one yacht or vessel” within the specified range of load water-line length, does not require the defender to race a vessel of the same type or "evenly matched” to that of the challenger and does not preclude the defender’s use of a catamaran. Because the deed provisions on *270 these issues are unambiguous, we may not look beyond the four corners of the deed in ascertaining the donors’ intent and therefore may not consider any extrinsic evidence on the meaning of these provisions. Consequently, we reject the analysis of the dissent, which repeatedly resorts to extrinsic evidence to support its construction of the terms of the deed (dissenting opn, at 281-283, 285-286, 287-28S).[2] Indeed because the plain language of the Deed of Gift is unambiguous, such resort to extrinsic evidence to impute a different meaning to the terms expressed is improper[3] (Central Union Trust Co. v Trimble, 255 NY, at 93, supra).
B
We also reject Mercury Bay’s contention that notwithstanding the plain language of the Deed of Gift, San Diego breached its fiduciary duty as the trustee of the America’s Cup. We have described a fiduciary’s duty as requiring "[n]ot honesty alone, but the punctilio of an honor the most sensitive” (Meinhard v Salmon, 249 NY 458, 464; see also, 2A Scott, Trusts § 170, at 311 [Fratcher 4th ed]; Restatement [Second] of Trusts § 170). This strict standard is the usual and appropriate measure of a trustee’s fiduciary obligations because the trustee must administer the trust for the benefit of the beneficiaries and cannot compete with the beneficiaries for the benefits of the trust corpus (2A Scott, Trusts § 170 [Fratcher 4th ed]; Restatement [Second] of Trusts § 170). Thus, the trustee owes the beneficiary an undivided duty of loyalty and cannot, for example, take the economic benefit of a trust (see, e.g., Matter of Scarborough Props. Corp., 25 NY2d 553, 558).
Unlike the trusts in which this strict rule of undivided loyalty was developed, the America’s Cup trust promotes a sporting competition in which the donors clearly intended that the trustee compete on equal terms with the trust benefi *271 ciaries.[4] Indeed, the trustee of the America’s Cup is obligated to use its best efforts to defend its right to hold the Cup and thus to defeat the beneficiaries in the contemplated competition. It is thus inappropriate and inconsistent with the competitive trust purpose to impose upon the trustee of a sporting trust such as this one the strict standard of behavior which governs the conduct of trustees who are obligated not to compete with the trust beneficiaries.
To be sure, the trustee of the America’s Cup is obligated to act in good faith and in the spirit of friendly competition by reasonably attempting to reach an accord on the terms of the matches to be held. Where that is not possible, however, the specific terms of the deed govern and the trustee must use its best efforts to compete for the Cup within the specified terms. As we have discussed, by racing a vessel which met the load water-line specifications in the Deed of Gift and which was constructed in its country, San Diego fully complied with the terms and spirit of the trust instrument. The deed placed no other restraints on the defending club’s efforts to win the competition, even though the defending club was also designated the trustee. Thus there can be no argument that the trustee was obligated to construe the deed in a way contrary to its plain language. We conclude that in the context of this sporting trust, San Diego fulfilled its fiduciary obligations by reasonably trying to come to an agreement on the terms for Mercury Bay’s proposed match, and failing that, by faithfully adhering to the challenge provisions in the deed.
We reject Mercury Bay’s contention that San Diego was required to race a vessel of the same type as its challenging vessel because it was only in that way that San Diego could administer the trust so as to give Mercury Bay, a trust beneficiary, a "fair” competition. This amounts simply to an argument that San Diego’s conduct was "unsportsmanlike” and "unfair”, issues which, as we have discussed, the Deed of Gift appropriately leaves to yachting experts.
We conclude therefore that in racing a catamaran, San Diego complied with the terms of the Deed of Gift and did not violate any fiduciary obligation owed under those terms or in *272 the administration of the trust. Any question as to sportsmanship and fairness, such as the propriety of races between monohull and multihull vessels, are questions which the trust instrument appropriately leaves to the expertise of persons actively involved in yacht racing; they are not questions suitable for judicial resolution.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. The Deed of Gift provides: "In case the parties cannot mutually agree upon the terms of a match, then three races shall be sailed, and the winner of two of such races shall be entitled to the Cup. All such races shall be on ocean courses * * * [These ocean courses] shall be selected by the Club holding the Cup; and these races shall be sailed subject to its rules and regulations so far as the same do not conflict with the provisions of this deed of gift, but without any time allowances whatever” (emphasis added). In light of this plain language, and the undisputed fact that the applicable rules of the San Diego Yacht Club provide that an IYRU jury was to resolve protests arising out of the match, the fact that amici curiae argue that the courts should resolve the question of the propriety of San Diego’s defense (see, dissenting opn, at 277-278) is simply irrelevant. This court may properly determine only the legal issues with which it is presented.

. Nor is it appropriate to our judicial function to rely in our analysis upon the various views expressed in the media as to the merit of the contentions of these litigants.

. The fallacy of this approach is demonstrated by the writings in this case. The dissenters, agreeing with Supreme Court, read selected portions of various items of extrinsic evidence to support their position. A majority of the Appellate Division, however, upon reviewing that same extrinsic evidence, reached precisely the opposite conclusion (see, Mercury Bay Boating Club v San Diego Yacht Club, 150 AD2d 82, 93-95). Thus contrary to the view taken by the dissenters, the extrinsic evidence is neither unassailably consistent nor dispositive and should not be read to contradict the plain language of the trust instrument itself.

. While there is authority for the proposition that trusts created for the purpose of promoting sporting events are not true charitable trusts (see, Restatement [Second] of Trusts § 374, at 262; 4A Scott, Trusts § 374.6A, at 227-228 [Fratcher 4th ed]; In Re Nottage, 2 Ch 649 [Eng 1895] [trust to promote the sport of yacht racing is not a charitable trust]), no one has disputed the characterization of this trust as a charitable trust.