**MILESTONE SHIPPING, S.A., Plaintiff,**

v.

**ESTECH TRADING LLC, et al., Defendants.**

**No. 11 Civ. 0014(VM).**

United States District Court, S.D. New York.

Sept. 8, 2011.

Claurisse Ann Campanale–Orozco, Thomas Leonard Tisdale, Tisdale Law Offices, L.L.C., New York, NY, for Plaintiff.

James C. Winton, Baker & Hostetler LLP, Houston, TX, John Siegal, Baker & Hostetler LLP, Garth S. Wolfson, Mahoney & Keane, LLP, New York City, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

This action arises out of a maritime dispute between plaintiff Milestone Shipping, S.A. ("Milestone") and defendants Estech Trading, LLC ("Estech") and American Energy Services, Inc. ("AES," and together with Estech, "Defendants"). Milestone alleges breach by Estech of two maritime contracts, a charter party agreement for the shipping of iron ore from Mexico to China (the "Charter Party") and a related escrow agreement ("Escrow Agreement").

On January 3, 2011, the Court granted Milestone's *ex parte* motion for the issuance of a maritime attachment and garnishment order ("Attachment Order") with regard to certain funds (the "Attached Funds") alleged to be held pursuant to the Escrow Agreement and under the control of garnishee Mahoney & Keane, LLP ("M & K"). By Decision and Order dated February 7, 2011, 764 F.Supp.2d 632 (S.D.N.Y. 2011), the Court denied a motion filed by AES to vacate the Attachment Order. The Court also found that proposed cross-motions by Milestone and AES for return of the Attached Funds to their respective possession were not ripe for review on the limited record then before the Court. The parties have now completed a significant portion of discovery,[1] and Milestone moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") on its claims relating to its entitlement to the Attached Funds. AES cross-moves for summary judgment on all of Milestone's causes of action.[2]

For the reasons discussed below, the Court DENIES Milestone's motion and GRANTS AES's motion in part.

## I. BACKGROUND [3]

In late 2010, defendant Estech, a recently formed—and possibly now defunct—en-

---

1. Milestone and AES have agreed to postpone certain foreign discovery relating to Milestone's damages pending the resolution of the instant motions.

2. Milestone's amended complaint ("Amended Complaint") asserts claims for (1) breach of contract against Estech, (2) alter-ego and joint venture against AES, (3) fraud against both Defendants, and (4) maritime attachment. While Milestone's motion does not address the specific basis for its breach of contract claim, AES seeks dismissal of all four causes of action.

3. The factual summary below is derived from the following documents and any declarations

incorporated therein by reference or exhibits attached thereto: Plaintiff Milestone Shipping S.A.'s Rule 56.1 Statement In Support of Its Motion for Summary Judgment ("Pl. 56.1 Statement"); AES's Local Rule 56.1 Statement of Material Facts Of Which There Is No Genuine Triable Issue ("AES 56.1 Statement"); Defendant's Local Rule 56.1 Statement of Disputed Facts and Request to Defer Ruling on Certain Issues to Allow Discovery Pursuant to Fed.R.Civ.P. 56(d)(1) ("AES's Counterstatement"); and Plaintiff's Local Rule 56.1 Statement in Response to American Energy Services' Local Rule 56.1(a) Statement ("Pl. Counterstatement"). Except where specifically noted, no further reference to these sources will be made.

tity created by two Ohio businessmen, hoped to become an international broker of iron ore. In order to execute its vision, Estech entered into a variety of contracts. Indeed, it entered into multiple contracts with multiple parties across multiple international borders. There was a contract to buy the iron ore in Mexico and a contract to resell it in China. There was a contract to charter a ship to transport the iron ore (*i.e.*, the Charter Party), and another to provide financial security for the ship owner, plaintiff Milestone, in the event that Estech failed to obtain cargo for the ship (*i.e.*, the Escrow Agreement). There were also three separate agreements for financing, furnished by defendant AES and documented in three separate promissory notes. The first financing contract provided funds for a performance bond required by the Chinese buyer. Another financing contract (executed third in time) was used to cover what appears to have been a last minute demand for additional payment by the Mexican seller. The third financing contract (executed second in time) was envisioned, ultimately, to fund the Escrow Agreement that Milestone required of Estech. This last resulted in yet another contract, a trust agreement ("Trust Letter"), between financier AES and the New York law firm designated as escrow agent by the Escrow Agreement (*i.e.*, M & K). And then there was one final contract entered into on December 10, 2010 (the "December 10 Agreement"), whereby Estech's founders and AES specified terms for repayment of AES's loans, and agreed that, if the instant iron ore brokering enterprise became profitable, they would all go into the iron ore business together.

It seems that the venture failed spectacularly, a result that may derive from the elaborateness of the business arrangements described above and Estech's apparent inexperience in the world of iron ore brokering. Not surprisingly, Estech is now nowhere to be found, and has not appeared in this litigation (although its founders did appear for deposition).

The instant dispute between Milestone and AES, concerning which of the entities involved is entitled to receive the $500,000 posted by AES and required under the Escrow Agreement, hinges on the import of four of the agreements described above: the Charter Party and Escrow Agreement, the Trust Letter and the December 10 Agreement. The Court provides a fuller description of the parties and transactions below for context.

## A. *THE PARTIES*

Milestone is a foreign corporation operated by Chaika Agency Co. ("Chaika"), a Ukrainian company, and possessing an office and place of business in Panama. Milestone owns the vessel M/V SANTA BARBARA ("Vessel"), which was chartered by Estech pursuant to the Charter Party.

Estech is an Ohio limited liability company formed in 2010 by Ohio businessmen Jan Michalek ("Michalek") and Daniel M. Slane ("Slane").[4] Michalek is the sole member of Estech, which has no other officers, directors or employees. Estech was created to engage initially in a single brokerage transaction (the "Iron Ore Deal"), namely, to purchase iron ore from a Mexican seller, Group Martinez Hipolito

---

**4.** Slane is the co-owner of The Slane Company, an Ohio-based entity that engages in various business ventures. Slane is a friend and former business associate of Estech's owner, Michalek, and is also a close friend of AES's President, Gerald S. Jacobs. Although Slane has no formal ownership or employment relationship with Estech, he did profess to be one of its founders, and he appears to have acted as Estech's agent in connection with the Iron Ore Deal (defined *infra*).

S.A. de C.V. ("Hipolito"), and resell it to a Chinese buyer, Tianjan Materials and Equipments (Group) Corporation ("Tianjan"). Estech then entered into negotiations with Milestone to arrange for the transport of the iron ore from Mexico to China.

AES is an Ohio corporation formed in 1976 by its current President, Gerald S. Jacobs ("Jacobs"), to invest primarily in oil and gas transactions in Ohio, Pennsylvania, West Virginia and Kentucky. From time to time, however, AES makes loans to a variety of businesses which present opportunities for profit. AES employs only two individuals, General Counsel Thomas Moloney ("Moloney") and a financial officer/administrator. Jacobs's wife is AES's sole shareholder.

## B. *THE DISPUTED TRANSACTIONS*

### 1. *The Tianjan Loan*

In November 2010, Estech entered into a sales contract with Tianjan to sell iron ore to Tianjan over a twelve-month installment period. The agreement required Estech to post a performance bond to Tianjan ("Tianjan Bond") in the amount of $344,000. On November 19, 2010, Slane approached AES on behalf of Estech seeking financing for the Tianjan Bond. AES agreed, and a loan from AES to Estech in the amount of $344,190 was subsequently memorialized in a promissory note dated December 6, 2010.

### 2. *The · Charter Party and Escrow Agreement*

During November and December of 2010, Estech was engaged in negotiations with Milestone to hire a vessel to transport the iron ore provided by Mexican seller Hipolito from Mexico to China. As a precondition to entering into the final Charter Party, however, Milestone first required Estech to sign the Escrow Agreement, whereby Estech would deposit $500,000

into an escrow account ("Escrow Account") under the control of escrow agent M & K. The Escrow Account was to serve as security for Milestone in the event that Estech failed to fulfill certain obligations specified in both the Charter Party and the Escrow Agreement. This included providing coverage for Milestone's loss of freight in the event that the cargo was not loaded on the specified date.

### 3. *The Trust Letter*

On December 1, 2010, Slane returned to AES and asked to borrow the $500,000 required to fund the Escrow Account. However, AES refused to lend Estech additional funds without collateral in place, which Estech could not provide. Following a telephone call between Slane and a Milestone representative, Slane informed AES that it would suffice for AES to wire the $500,000 to M & K in New York, simply to demonstrate that Estech had access to the funds required by the Escrow Agreement. AES agreed to this proposition, and its General Counsel, Moloney, contacted M & K to arrange the wire transfer. Moloney spoke to M & K partner Garth S. Wolfson ("Wolfson"), advising him that AES had been asked to wire $500,000 to be held in trust with regard to the pending Charter Party. Moloney also requested that M & K confirm in writing that M & K would return the money to AES upon demand. Wolfson reported the substance of his conversation with Moloney to Milestone's London-based counsel, Mark Seward ("Seward"), via e-mail, stating:

> They say they are supposed to wire $500,000 to our account simply to prove they have such funds available. They want me to first confirm in writing that the funds must and will be wired back to them at any time upon their demand, whether or not other security is in place.

Is that true: should I send them such written confirmation?

(AES 56.1 Statement Ex. 11.) Shortly thereafter, Seward replied to Wolfson, "[y]ou can confirm the money will be wired back 'if the charterparty [sic] and escrow are not executed'. We intend to execute the escrow tonight and I will send you the final version when it is to hand shortly[.]" (*Id.*) Wolfson did not forward Seward's response to AES.

While these discussions between Wolfson and Seward were occurring without AES's knowledge, Moloney drafted a letter memorializing the agreement between AES and M & K, which, per Moloney and Wolfson's discussion, Wolfson was to return to AES executed on M & K letterhead. Moloney then e-mailed his draft to Wolfson, which read:

Subject: Milestone Shipping, S.A.—
Estech Trading, LLC
Subject:

Gentlemen,

This is to confirm our firm's agreement that, if American Energy Services, Inc. ("AES") wire transfers $500,000 to our firm's trust account pursuant to the wiring instructions below, our firm shall hold such funds in trust and shall, upon written request from AES to do so, wire that same $500,000 back to AES's designated account as soon as possible after our receipt of that request.

[INSERT WIRING INSTRUCTIONS]

We acknowledge that this wiring transaction is being initiated in connection with the pending arrangements between the subject parties and that we are authorized to notify Milestone Shipping S.A. both upon receipt of the wire from AES and upon receipt of any instructions from AES to wire back the funds transferred to our firm's account. We also understand that, if an escrow agreement acceptable to all parties can be reached, our firm may act as escrow

agent under such an agreement, in which case AES may direct that these funds be retained by our firm in such capacity. However, in no event shall any notification to Milestone Shipping S.A. or any discussions prior to reaching an acceptable agreement affect our firm's duty to return that $500,000 to AES upon its written request.

[signed on behalf of M & K]

(*Id.* Ex. 12.) Wolfson forwarded this letter to Milestone's counsel, Seward, inquiring whether Wolfson was authorized to execute it. Wolfson did not comment on the draft's substance, nor did Wolfson inform Seward that he had not communicated Seward's earlier instruction to AES. Seward replied by e-mail, "[c]an you sign and return to them when you get in. I would like Slane to have it when he wakes up!" (*Id.* Ex. 13.) Wolfson transferred Moloney's letter to M & K letterhead, inserted wiring instructions, and returned an executed copy (*i.e.*, the Trust Letter) to AES. Upon receipt of the Trust Letter, AES transferred $500,000 to M & K.

4. *The Escrow Account and the Escrow Loan*

The final Escrow Agreement was executed by Milestone, Estech and M & K, as escrow agent, on December 2, 2010, the same day that M & K received AES's transfer. Pursuant to the terms of the Escrow Agreement, M & K is required to turn over $500,000 held in the Escrow Account to Milestone in the event of certain specified breaches of the Charter Party by Estech. Funding of the Escrow Account was a pre-condition to the execution of the Charter Party.

On December 6, 2010, Estech executed a second promissory note, this time in the amount of $500,000, payable upon demand to AES. Moloney testified that the interest on that note was the minimum that AES

expected to be compensated for the use of its money during the time that the funds were tied up in the Iron Ore Deal.

### 5. *The December 10 Agreement*

Four days later, Estech and AES entered into the December 10 Agreement. In consideration for the two loans that AES had already furnished, Estech agreed to certain repayment terms, which included a twenty-five percent share of the Iron Ore Deal's net proceeds. The December 10 Agreement also envisioned that, in the event that Estech were to enter into future contracts to broker iron ore to Chinese buyers, Michalek, Slane and AES would restructure Estech as a new entity, with ownership and responsibilities to be apportioned among the three founders.

### 6. *The Hipolito Loan*

On December 21, 2010, Hipolito, the Mexican ore seller, demanded an additional advance in order to transport its iron ore to port for loading. AES agreed to lend Estech $312,500 for this purpose, and paid the money directly to Hipolito. The sum became the subject of a third promissory note between AES and Estech.

### 7. *The Fallout*

Two days later, Estech's house of cards began to topple. Notwithstanding the additional money AES paid to Hipolito, Hipolito apparently failed to produce the iron ore. With the Vessel sitting in a Mexican port waiting to be loaded, Estech notified Milestone on December 23, 2010 that it was canceling the Charter Party due to its inability to obtain cargo. Later that day, both Milestone and AES contacted M & K, seeking turnover of the $500,000 held by M & K. Milestone claimed that it was entitled to the funds held in the Escrow Account pursuant to the Escrow Agreement, while AES declared that the funds were still subject to trust under its Trust Letter. Given these competing claims, M & K refused to release the funds to either party, and the $500,000 subsequently became the Attached Funds currently subject to attachment pursuant to the Attachment Order issued by this Court.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

Pursuant to Rule 56, a court may grant summary judgment if, on the record before it, there exists "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Alabama v. North Carolina*, —— U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010). In determining whether disputed issues of material fact exist, a court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *See, e.g., Shapiro v. New York Univ.*, 640 F.Supp.2d 411, 418 (S.D.N.Y.2009) (*citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the burden of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). When deciding cross-motions for summary judgment, the standard to be applied "is the same as that for individual summary judgment motions and a court must consider

each motion independent of the other." *Schultz v. Stoner*, 308 F.Supp.2d 289, 298 (S.D.N.Y.2004) (quotation marks omitted).

■ In a contract dispute, a motion for summary judgment may be granted if "the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

### B. ANALYSIS

The overarching legal question posed by the parties' motions, and indeed this litigation generally is, who is entitled to receive the Attached Funds? To answer that large question the Court must consider a series of smaller questions raised by Milestone's Amended Complaint and the parties' motions. First, is the disposition of the Attached Funds currently controlled by the Escrow Agreement or the Trust Letter? Second, were Estech and AES joint venture partners in the Iron Ore Deal, such that AES could be liable for any contractual breach by Estech? Third, did Estech and AES fraudulently induce Milestone to enter into the Escrow Agreement and Charter Party? A final question, which operates as a threshold to the entire analysis, but upon which, for reasons discussed below, the Court does not pass judgment at this time, is: did Estech in fact breach its Charter Party with Milestone?

The Court considers each of these questions in turn.

### 1. Disposition of the Attached Funds

■ Looking first to whether the Escrow Agreement or the Trust Letter controls the Attached Funds, the Court observes that the most contentious issue raised by the parties is rather straightforward. Milestone argues that, since deposit of $500,000 into the Escrow Account was a precondition to the execution of the Charter Party, the funds must have been deposited into escrow. Otherwise, Milestone reasons, the Charter Party, which was in fact executed, could not have been executed. Essentially, therefore, Milestone asserts that because it entered into the Escrow Agreement and Charter Party, it is secured by the Attached Funds. Milestone's logic is circular and unpersuasive.

The most reliable means of determining entitlement to the Attached Funds is, as the saying goes, to follow the money. The origin of the Attached Funds is not in dispute; all parties here agree that AES wired the money to M & K, and that, at least initially, disposition of the Attached Funds was controlled by the Trust Letter. It falls to the Court to determine whether this state of affairs ever changed.

■ The standard for interpreting a trust instrument is well-established. "[A] trust instrument is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself." *In re Chase Manhattan Bank*, 6 N.Y.3d 456, 813 N.Y.S.2d 361, 846 N.E.2d 806, 808–09 (2006); *see also Cent. Union Trust Co. v. Trimble*, 255 N.Y. 88, 174 N.E. 72, 73 (1930) ("We are to ascertain the intention from the words used and give effect to the legal consequences of that intention when ascertained."). A court may not look first to extrinsic evidence, such as evidence of the parties' intent, to determine the meaning of a trust instrument. *See Mercury Bay Boating Club Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 557 N.Y.S.2d 851, 557 N.E.2d 87, 93 (1990). "It is only where the court determines the words of the trust instrument to be ambiguous that it may properly resort to extrinsic evidence." *Id.*

■ Whether a contract is ambiguous is a matter of law to be determined by the

court. *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir.2010). Ambiguity exists when the terms used in the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir.2010) (quotation marks omitted). Parties to a contract may not create ambiguity merely by urging different interpretations of the language in question, nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) (internal quotation marks omitted).

As set forth in the Trust Letter, AES's right to demand return of its funds is unambiguous and unrestricted. The Trust Letter provides, "if [AES] wire transfers $500,000 to [M & K's] trust account ... [M & K] shall hold such funds in trust and shall, upon written request from AES to do so, wire that same $500,000 back to AES...." (AES 56.1 Statement Ex. 14.) Milestone, however, asserts that AES's right to demand return lasted only until the Escrow Agreement was executed, at which point the $500,000 would automatically become subject to the Escrow Agreement. This interpretation is contradicted by the plain terms of the Trust Letter, which states, "*if* an escrow agreement acceptable to all parties can be reached ... AES *may* direct that these funds be retained by [M & K] in such capacity." (*Id.* (emphasis added).) Although this language envisions the possibility that the funds could become subject to the Escrow Agreement, it does not provide any mechanism for that event to occur absent an explicit direction from AES. AES never gave such a direction.

Milestone also argues that its position is supported by the final sentence of the Trust Letter, which provides, "[h]owever, in no event shall any notification to [Milestone] or any discussions prior to reaching an acceptable [escrow] agreement affect [M & K's] duty to return that $500,000 to AES upon its written demand." (*Id.*) Milestone asserts that this language indicates that AES's entitlement to demand the return of its funds was extinguished upon the execution of the Escrow Agreement. Again, Milestone misreads the plain text. In fact, this final sentence simply identifies with specificity two occurrences—*i.e.*, (1) M & K providing notice to Milestone and (2) discussions prior to execution of the Escrow Agreement—that *shall not* affect M & K's obligation to return AES's funds. Stated differently, the sentence reinforces the absence of any restriction upon AES's right to demand return of the money. It does not create a new limitation on that right.

Further, contrary to Milestone's urging, the $500,000 promissory note between Estech and AES does not alter the meaning of the Trust Letter. Although there may be some uncertainty as to why AES would require documentation of a loan to Estech where AES had retained control of the disposition of its funds via the Trust Letter, one might presume that the note was executed in anticipation of a future time at which AES would direct its funds to be turned over to the Escrow Account. In any event, the note is extrinsic evidence which the Court may not consider in construing the unambiguous terms of the Trust Letter.[5]

---

**5.** To the extent that any dispute might arise as to the significance of the $500,000 promissory

In short, according to the plain terms of the Trust Letter, the Attached Funds remain subject to the Trust Letter, free of encumbrance by the Escrow Agreement. Absent the Court's Attachment Order, they must be returned to AES by M & K upon AES's written demand.

### 2. Joint Venture

■ Pursuant to New York choice-of-law rules, Ohio law governs the question of whether a joint venture existed between Ohio corporations Estech and AES. *See Zion v. Kurtz,* 50 N.Y.2d 92, 428 N.Y.S.2d 199, 405 N.E.2d 681, 684 (1980); Rest.2d Conflict of Laws § 302 (1971). Under Ohio law, the elements of a joint venture are: (1) intent, by way of express or implied contract, to engage in and carry out a single business adventure for profit; (2) a contribution from all parties of effort, property, money, skill or knowledge; (3) equal authority to direct and control all aspects of the enterprise; and (4) sharing of profits and losses. *See Grendell v. Ohio Envtl. Prot. Agency,* 146 Ohio App.3d 1, 764 N.E.2d 1067, 1075–76 (9th Dist.2001).[6]

■ Milestone asserts that the December 10 Agreement, considered alongside the three financing loans AES made to Estech, evidences an intent by AES and Estech to become joint venture partners in the Iron Ore Deal. This argument fails. In fact, with respect to the Iron Ore Deal, the December 10 Agreement merely states the terms by which Estech will repay the first two loans made by AES, *i.e.,* right of immediate repayment and a twenty-five percent share of net profits. The December 10 Agreement does envision the possibility that Michalek, AES and Slane will, at some point in the future, restructure Estech as a joint venture if. additional Chinese iron ore deals materialize.[7] However, there is no basis upon which to mutate this statement of future intent into an agreement to create a joint venture in the present. In addition to the absence of present intent to form a joint venture, the there is no support for finding that AES had a right to direct or control any aspects of the Iron Ore Deal, or that AES was exposed to any potential losses arising out of the Iron Ore Deal. The three, arms-length promissory notes do not alter that conclusion.

Given this evidence, there are no genuine issues of material fact which could support a finding that AES and Estech were joint venture partners in the Iron

---

note in light of AES never having directed its funds be transferred to escrow, that dispute lies between Estech and AES alone. Milestone has no standing to contest the meaning of a promissory note to which it is not a party. *See Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir.2009) ("A non-party to a contract· governed by New York law lacks standing to enforce the agreement in the absence of terms that clearly evidence an intent to permit enforcement by the third party in · question." (quotation marks and alteration omitted)).

**6.** Under New York law, which Milestone cites without discussing the appropriateness of its choice of law, the test for joint venture is similar. *See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.,* 909 F.2d 698, 701 (2d Cir.1990).

**7.** On this subject, the December 10 Agreement provides:

> It is the intention of the parties that, if Estech or its principal, [Michalek], is to enter into additional sales contracts with [Tianjan] or other buyers located in China for the sale and delivery of iron ore ("New Contracts"), [Michalek], AES and [a Slane entity] shall enter into an operating agreement to restructure the ownership of Estech, effective no later than the execution of the first of the New Contracts.
> Subject to appropriate legal and tax advice, this operating agreement would provide [for joint control, sharing of proceeds, and specified division of responsibilities among Michalek, AES and the Slane entity].

(Decl. of Claurisse Campanale–Orozco Ex. 9.)

Ore Deal. Consequently, AES is entitled to judgment as a matter of law on Milestone's joint venture claim.[8]

### 3. *Fraudulent Concealment*

Milestone's Amended Complaint also asserts that Milestone was the victim of a fraud perpetrated by Estech, AES and Slane. Specifically, Milestone asserts that neither it nor M & K were ever informed that the funds transferred by AES to M & K were not intended as funding for the Escrow Agreement, or that AES did not intend to release its funds into escrow until Estech provided it with some form of collateral for the $500,000 loan.

■ A claim for fraudulent concealment under New York law requires a sufficient showing that (1) the defendant made a material omission, (2) the defendant intended to defraud the plaintiff thereby, (3) the defendant had a duty to disclose the material information, (4) the plaintiff reasonably relied upon the defendant's representations, and (5) the plaintiff suffered damage as a result. *See, e.g., Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,* 57 F.3d 146, 153 (2d Cir.1995). Milestone's fraud claim fails on at least three of the preceding grounds.

■ First, there is no basis in the record to support a reasonable conclusion that AES intended to defraud Milestone. Indeed, Moloney specifically advised Wolfson of the terms that AES required in the Trust Letter. Second, Milestone cannot show that AES, which was not in contractual privity with Milestone and, in fact, never had any direct communications with Milestone, owed any duty of disclosure. Third, Milestone could not have reasonably

relied on any supposed misrepresentations made by AES. Milestone's counsel, Seward, was advised by M & K of the terms upon which AES would entrust its funds to M & K. And, most critically, Seward received a draft of the Trust Letter prepared by Moloney, which he then instructed Wolfson to sign. Having been afforded ample opportunity to review the terms of the Trust Letter prior to its execution, Milestone, which is not even bound by the Trust Letter, may not now claim that it was fraudulently misled. *See Stokes v. Lusker,* 425 Fed.Appx. 18, 21–22 (2d Cir. 2011) (affirming dismissal of fraud claim where plaintiff was in possession of contract but failed to review provisions which truthfully disclosed the facts that plaintiff alleged to have been misrepresented).

### 4. *Breach of Charter Party*

Finally, AES moves for summary judgment on Milestone's claim for breach of the Charter Party against Estech. Yet AES—which, as the Court found above, did not establish a joint venture with Estech in connection with the Iron Ore Deal—has not demonstrated that it has standing to oppose that claim on Estech's behalf. *See Premium Mortg. Corp.,* 583 F.3d at 108. As the Court noted above, Estech has not responded to the Amended Complaint and, in fact, has never appeared in this action. Nor has Milestone moved for default judgment as to Estech.

The Court does observe as a preliminary matter that Milestone admits that a fully funded Escrow Agreement was a precondition to the formation of a valid Charter Party, and the Court has now determined that the Attached Funds never became

---

8. Milestone's Amended Complaint also alleges that AES and Estech possess an agency or alter ego relationship. Milestone does not argue in support of this theory in its instant motion, and the record contains no evidence which could support a finding that the rela-

tionship between Estech and AES in connection with the Iron Ore Deal was anything other than arms-length. Therefore, AES is entitled to judgment as a matter of law on these claims, as well.

subject to escrow. It may in fact be the case, therefore, that no enforceable Charter Party ever existed. However, the Court need not rule on that question at this time: Milestone has not raised it, and Estech has not appeared to challenge the Charter Party's enforceability.

### III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 47) of plaintiff Milestone Shipping, S.A. ("Milestone") for summary judgment seeking distribution of certain funds ("Attached Funds") subject to the Court's January 3, 2011 Order of Maritime Attachment and Garnishment ("Attachment Order") is DENIED; and it is further

**ORDERED** that the motion (Docket No. 56) of defendant American Energy Services, Inc. ("AES") for summary judgment on all claims for relief asserted by Milestone is GRANTED in part; and it is further

**ORDERED** that the Attachment Order (Docket No. 3) is hereby VACATED; and it is further

**ORDERED** that garnishee Mahoney & Keane, LLP is directed to transfer the funds heretofore designated as the Attached Funds to AES upon written demand by AES; and it is further

**ORDERED** that Milestone is directed to inform the Court within ten days of the date of this Decision and Order of its intention with regard to further prosecution of this action.

**SO ORDERED.**