Matter of Lipson (2024 NY Slip Op 50037(U))

[*1]

Matter of Lipson

2024 NY Slip Op 50037(U)

Decided on January 16, 2024

Surrogate's Court, Monroe County

Ciaccio, S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 16, 2024
Surrogate's Court, Monroe County

Accounting By Dawn F. Lipson As The Successor Trustee Of The Jacques M. Lipson Living Trust U/A 
 Dated 8/19/1999 And As Attorney-In-Fact

File No. 2016-1179

Christopher S. Ciaccio, S.

Dawn Lipson, the successor trustee of the Jacques M. Lipson Living Trust, has petitioned for judicial settlement of her final accounting, which she filed on January 25, 2018.
Judi Lipson and Elaine Dwyer, adopted daughters of the late Jacques M. Lipson and distributees of the Trust, filed Objections. 
Among other things, they assert that the successor trustee, who was Jacques Lipson's third wife and who received her appointment after her husband, the settlor and sole beneficiary of the Trust, became incapacitated, substantially depleted the assets of the trust both after he became incapacitated and then after his death, so that there were no funds to pay specific and residuary distributions to the Objectants (and others). 
Judi and Elaine (the "Objectants") move pursuant to CPLR 3212 for partial summary judgment seeking to hold the successor trustee liable for breach of fiduciary duty and directing her to reimburse the trust in the amount of $2,314,149.19.
BACKGROUND
Little of what may be described as factual is controverted.
Dawn Lipson ("Dawn") married Dr. Jacques M. Lipson (Dr. Lipson") on May 1, 1998. Dawn was Dr. Lipson's third wife; his previous two marriages having ended in divorce. Dr. Lipson had two children from his first marriage, Judi Lipson and Elaine Dwyer ('the Objectants").
In August 1999 Dr. Lipson established as his primary estate planning vehicle the Jacques M. Lipson Living Trust (the "Trust"), a self-settled revocable "lifetime trust" (EPTL 1-2.20). He subsequently amended the Trust five times, most recently on April 19, 2013. The Trust names Dr. Lipson, the settlor of the Trust, as the sole trustee and sole beneficiary. Upon his death or [*2]incapacity, Dawn Lipson would become successor trustee.
The Trust provided under Article Six for "Specific Distributions of Trust property" by the (successor) Trustee upon the death of the Grantor. 
Among the distributions to be made were the following:
-the sum of Ten Thousand dollars ($10,000.00) to his long-time medical secretary.
-The sum of One Million dollars ($1,000,000.00) to his wife, Dawn. 
 -Two Million dollars ($2,000,000.00) to the Rochester Area Community Foundation, as an "advised fund," to be "maintained in perpetuity," with Dawn as the fund advisor, with the right to "recommend distributions from the principal for naming purposes to such qualified charitable organizations as she deems proper. . ."
 -The sum of One Hundred Twenty-Five Thousand dollars ($125,000) to be held in trust for the benefit of a grandson, Richard Tamblin, and an equal amount to be held in trust for his granddaughter, Maria Tamblin.
 -The marital residence, to Dawn Lipson
Additionally, the Trust provided that three separate timeshare units in Florida were to be distributed, one each, to Judith Tamblin, to Dawn Lipson, and to Elaine Dwyer.
Pursuant to Article Seven, all trust property "not previously distributed, after payment of all debts, expenses and taxes" was to be distributed as follows: one-third to Dawn Lipson, one-third to Elaine Dwyer, on-ninth to Judith Tamblin, one ninth to granddaughter Maria Tamblin, and one-ninth to grandson Richard Tamblin.
In March 2012, Dr. Lipson suffered a "devastating thalamic stroke." Medical records indicate that "since that time," Dr. Lipson "suffered from multi-infarct dementia," and experienced hallucinations. Shortly after he closed his medical practice.
On April 19, 2013, Dr. Lipson gave his wife Dawn authority to act as attorney-in-fact (i.e., power of attorney).[FN1]

Dr. Lipson had another significant medical event requiring his hospitalization on September 11, 2013, and he was afterward admitted to the Jewish Senior Home on September 20, 2013.
In November 2013, Dr. Lipson was determined by two physicians to be incapacitated. On December 13, 2013, Dawn formally accepted her position as Successor Trustee. 
Dawn does not dispute that Dr. Lipson lacked capacity at least as of September 2013.
Dr. Lipson continued to reside at the Jewish Senior Home from his admission in September 2013 through his death on May 12, 2015.
As of May 13, 2015, the Trust assets consisted of the marital residence, the three timeshare units, and funds in three Wells Fargo Living Trust accounts with a valuation of $3,928,748.
Separately, at the time of his death, Dr. Lipson had more than $10 million in non-Trust assets, all of which passed to Dawn. Those included an IRA, which was valued at $2,172,991 at the time of Dr. Lipson's death and names Dawn as beneficiary; checking and saving accounts with Chase Bank valued at between $200,000-$300,000; and a joint account that Dr. Lipson had [*3]with Dawn, which was valued at $8,217,659 at the time of his death.
After September 13, 2013, and as successor trustee, Dawn began to pay out sums from the Trust to several charitable institutions to fulfill pledges that Dr. Lipson made before his incapacity. All pledges were made and paid out in the name of Dawn Lipson and Dr. Jacques Lipson as joint donors. 
After Dr. Lipson's incapacity, Dawn made more "joint" pledges, in the name of herself and Dr. Lipson, to many other charitable institutions, and satisfied those pledges from the Trust accounts, making payments even after Dr. Lipson had died. 
She also used Trust money to pay for household expenses, which she claims (and which the Objectants dispute) were to the benefit of Dr. Lipson, totaling $176,236.80.
By the term of a 1974 Separation Agreement with his first wife, Dr. Lipson had agreed to pay $50,000.00 to each of his daughters, the Objectants Judi Lipson and Elaine Dwyer.
Following Dr. Lipson's death, Dawn made some of the required distributions out of the Trust funds but not others. She distributed to herself the entire $1,000,000, the residence, and the timeshare. She distributed $1,735, 633.97 to the Rochester Area Community foundation, and made the distributions of $10,000.00 each to Judith Marchese and Linda Loughborough under Article 6(a) and (b). After those payments were made, nothing was left in the Trust to fund the specific distributions under Article 6(g) and (h) to Dr. Lipson's grandchildren, Richard Tamblin and Maria Tamblin. And there was nothing in the Trust to fund the remaining distributions under Article Seven.
Objectants also alleged that Dawn failed to appraise and sell the timeshares bequeathed to Dr. Lipson's daughters (Objectants Judi Tamblin and Elaine Dwyer) under Article 6(j) and (k), causing the timeshares to lapse. 
DISCUSSION
The framework for determining a summary judgment in a contested accounting proceeding is well-settled.
"The party submitting the account has the ultimate burden of demonstrating that all the assets of the estate have been fully accounted. . .. The objectant bears the initial burden of proffering evidence to establish that the account is inaccurate or incomplete, and, upon satisfaction of that burden, the burden shifts to the [fiduciary] to prove, by a preponderance of the evidence, that the account is accurate and complete" (Matter of Johnson, 166 AD3d 1435, 1436 [3d Dept 2018]; citing Matter of Jewett, 145 AD3d 1114, 1115—1116 [2016] [internal quotation marks, brackets and citations omitted]).
Where the objectant to the account is the party moving for summary judgment, he or she must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient admissible evidence to demonstrate the absence of any material issues of fact necessitating a trial ( Winegrad v New York Univ. Med. Ctr. , 64 NY2d 851, 853 [1985]; 2006905 Ontario Inc. v Goodrich Aerospace Can., Ltd. , 197 AD3d 1008 [4th Dept 2021]; Oddo v City of Buffalo , 159 AD3d 1519, 1520 [4th Dept 2018]).
"Sufficient evidence" then in the context of an accounting proceeding is "evidence . . . that the account is inaccurate or incomplete." (In re Taylor , 79 AD3d 766, 767, 912 NYS2d 651, 652 [2d Dept 2010]).
Once a prima facie showing has been made, the burden shifts to accounting party opposing the motion for summary judgment to produce evidentiary proof in admissible form, [*4]sufficient to establish the existence of material issues of fact which require a trial of the action (Alvarez , 68 NY2d at 324; Mortillaro v Rochester Gen. Hosp. , 94 AD3d 1497 [4th Dept 2012]).
Conclusory and speculative assertions are insufficient to defeat a motion for summary judgment (Trahwen, LLC v Ming 99 Cent City No.7, Inc. , 106 AD3d 1467 [4th Dept 2013], lv dismissed 21 NY3d 1066 [2013]).
The failure by the objecting party to make a prima facie showing that the account is inaccurate or incomplete requires a denial of the motion, regardless of the sufficiency of the opposing papers (see In re Will of Bellasalmo, 54 Misc 3d 1216[A][Sur Ct Queens County 2017]; Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; CPLR 3212 [b]; see also Malamas v Toys R Us — Delaware, Inc. , 94 AD3d 1438, 1438 [4th Dept 2012] [a moving party must affirmatively demonstrate the merits of its cause of action or defense and does not meet its burden by noting gaps in its opponent's proof]).
A summary judgment motion "shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." (CPLR 3212 [b]; Matter of Maloy , 75 Misc 3d 390, 395-396 [Sur Ct, Monroe County 2022]),
It is "the earmark of summary judgment that the court is confined to determining whether an issue of fact exists as a matter of law." (Owen v Hurlbut , 80 Misc 3d 1234(A), 197 NYS3d 926 [Sup Ct 2023], citing Phillips v Kantor & Co. , 31 NY2d 307, 315 [1972]).
Relevant to the discussion here, in New York, charitable pledges are enforceable because they constitute an offer of a unilateral contract that—when accepted by the charity by incurring liability in reliance thereon—becomes a binding obligation (Paul and Irene Bogoni Found. v St. Bonaventure Univ., 78 AD3d 616, 617 [1st Dept 2010], citing Matter of Versailles Found. [Bank of NY], 202 AD2d 334 [1994]; and I. & I. Holding Corp. v. Gainsburg, 276 NY 427, 433 [1938]).
Disbursements the Successor Trustee made From The Trust During The Period Of Dr. Lipson's Incapacity But Before His Death
- Disbursements To Fulfill Charitable Pledges Made By Dr. Lipson Before His Incapacity
As recounted above, Dawn Lipson, once she became successor trustee, paid out money from the Trust to fulfill charitable pledges Dr. Lipson had made (all jointly with Dawn) before he became incapacitated in September 2013.
The Objectants claim the Trust agreement did not grant her the authority as successor trustee to use Trust money to pay joint pledges, and in doing so she breached her duty as successor trustee to the Objectants as "beneficiaries"[FN2]
- their word — of the Trust. That duty, [*5]claim the Objectants, obligated her to use her own money to pay one-half of the "joint" pledges.
To determine whether a trustee's distribution of trust assets was proper, the settlor's intent controls (Matter of In re Estate of Wallens , 9 NY3d 117, 122 [2007]).
In construing a trust, the court must as a "fundamental premise . . . look within the four corners of the trust instrument to determine the grantor's intent." (In re Accounting by Fleet Bank , 10 NY3d 163, 166 [2008], citing Mercury Bay Boating Club , 76 NY2d 256, 267 [1990]). The trust instrument is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself (see Mercury Bay Boating Club , 76 NY2d at 267; Central Union Trust Co. v Trimble , 255 NY 88, 93 [1930]; Matter of Chase Manhattan Bank, 6 NY3d 456, 460 [2006]). If, however, the terms of the trust are ambiguous, the court may consider extrinsic evidence to determine the decedent's intent (see In re Accounting by Fleet Bank at 166 ).
Here the Trust sets forth the authority of the successor trustee during a period of the Grantor's disability, in Article Four, Section 3 (Grantor's Rights During Disability). 
Section 3, subdivision "b." states that "My trustee during the period of my mental incapacity or physical disability shall pay to me or apply for my benefit as much of the principal and net income of this trust is my trustee in its sole discretion shall deem necessary or advisable."
Section 3, subdivision "e.", entitled "Tax Planning," reads that:
"During my life, should I become disabled, my (successor) trustee may exercise the following powers as agents on my behalf, either alone or in conjunction with any other agent under a durable power of attorney for me, but the primary concern of my (successor) Trustee shall be for my welfare and secondarily for the welfare of my lineal descendants for tax planning purposes:
1. My Trustee may make additional distributions to my lineal descendants, for the purpose of continuing any gift program initiated by me, which my Trustee reasonably determines will achieve beneficial results for estate and/or income tax planning purposes.
2. My Trustee may initiate a gift program on my behalf which my Trustee reasonably determines will achieve beneficial results for estate and/or income tax planning purposes, by making distributions to my lineal descendants so long as such distributions are made [*6]in the form which qualify for the annual exclusion for Federal gift tax purposes, and such distributions are equal in amount to such lineal descendants."
Section 3, subdivision "c.", entitled "Payment of Obligations," states that "My trustee, during the period of my mental incapacity or physical disability shall, from time to time, pay my valid obligations, my medical expenses and provide for my comfortable maintenance and welfare, taking into consideration my other income or resources."
Section 3, subdivision "d.", entitled "Trustee Guidelines," states that "... in making distributions under this section, my trustee shall give primary consideration to my circumstances."
Thus, as to the scope of the successor trustee's authority and discretion, the clear and unambiguous intent of the Trust Agreement is that during the period of Dr. Lipson's incapacity trust assets are to be preserved to provide for the care and comfort of Dr. Lipson, i.e., his "welfare," (Article Four, Section 3[c]), and the actions of the successor trustee must be measured against that.
"Secondarily," the successor trustee "shall" be concerned "for the welfare of my (Dr. Lipson's) lineal descendants" (Article Four, Section 3[c]), but with consideration of tax planning and consequences.
No language in Section Four, Article 3 gives the successor trustee the discretion to pay jointly made promises out of trust money, especially not when, as is admitted, Dawn had access to joint accounts containing several million dollars. The gifting authority is limited to "lineal descendants." It is not as if had Dawn not paid the total pledge amounts out of trust money, that the pledges would not have been fulfilled and Dr. Lipson would have failed to pay his "valid obligations." But Dawn had access to substantial other funds held in both her name and Dr. Lipson's. In breaching her fiduciary duty to preserve assets for Dr. Lipson's "welfare," and to fulfill his intended testamentary scheme, her use of Trust money to pay her share of the pledges was self-serving to an extraordinary degree.
The Petitioner argues that other language in the Trust purports to give complete discretion to the successor trustee to disburse funds from the Trust. The court disagrees and sees no conflict among the clear and unambiguous Trust provisions.
Article Ten Section 1(x) ("Exercise of Authority") provides that "Except as otherwise provided in this agreement my trustee shall have the power to do all acts that might legally be done by an individual in absolute ownership and control of property." However, that grant of authority appears in a section devoted to the Trustee's "Investment Powers," and is limited to exercises of discretion for that purpose. It is not inconsistent with the provisions cited herein requiring the successor trustee to act with regard to Dr. Lipson's care and comfort, i.e., his circumstances, and other provisions which refer to the extent of gifting authority. 
Article Three ("Appointment of Trustees,") Section 7 ("Responsibility of Successor Trustees") of the Trust provides that:
"A successor trustee shall have the same rights, powers, duties, discretions and immunities as if it had been named as initial trustee under this agreement."
That seemingly unlimited grant of power cannot override the successor's trustee's fiduciary duty to Dr. Lipson, and the fulfillment of his intent in carrying out the purposes of the [*7]Trust, which, to repeat, were to provide for his welfare and the welfare of his descendants.
This point carries considerable weight. Why else create a trust that provides for specific distributions to his descendants and provides for them to receive the residuary, if it could all be given away in the event he became incapacitated, thus defeating the entire testamentary scheme? It is not as if Dr. Lipson left Dawn with no other assets with which to fund her lifestyle and pay her share of the pledges. He left her nearly ten million dollars in joint accounts and IRAs. The parties assume he had the capacity to amend his Trust even after he suffered a "devasting thalamic stroke" in 2012, but the fact that he did not change the testamentary scheme and the distributions even after he had the stroke allows the reasonable inference that he did not intend to countenance wholesale depletions of the trust once he became incapacitated. 
As has been held, ". . . even when the trust instrument vests the trustee with broad discretion to make decisions regarding the distribution of trust funds, a trustee is still required to act reasonably and in good faith in attempting to carry out the terms of the trust." (Matter of In re Estate of Wallens , 9 NY3d 117 [2007], citing Matter of Bruches, 67 AD2d 456 [2d Dept.1979]; In re Abert's Estate, 118 NYS2d 864 [Sur. Ct., NY County 1950]).
The Trust by specific language makes that point. Article Nine, Section 8 ("Trust Administration" - "Limit on Trustee's Discretion") states that the successor trustee is bound "at all times" to act "in accordance with fiduciary principles . . ."
To repeat, then, Dawn's duty as successor trustee was to "pay any valid obligations, . . . medical expenses, and provide for (Dr. Lipson's) comfortable maintenance and welfare, taking into consideration . . . other income or resources" (Article Four Section 3 [c]), a responsibility further cemented by the language of Article Four Section 3 (d); which reads that "In making distributions under this section, my trustee shall give primary consideration to my circumstances." "Circumstances" is to be read with reference to the previous section. 
Thus, the Objectants have established entitlement to judgment as a matter of law with respect to the disbursements made after Dr. Lipson's incapacity to cover charitable pledges he made before he became incapacitated, because in using trust funds to cover her one-half share of the obligations, she was depleting trust money to the possible detriment of Dr. Lipson's "circumstances," contravening Dr. Lipson's intent to provide for the "welfare" of his lineal descendants and was exercising discretion not given to her by the Trust agreement.
Dawn also argues in opposition that there are "several questions of fact that preclude a grant of summary judgment with respect to this claim, including but not limited to Dr. Lipson and petitioner's customary pattern and practice, whether and to what extent Dr. Lipson communicated to petitioner and other third parties his intent to be solely liable for such pledges and when Dr. Lipson actually became incapacitated for purposes of the evaluation of objective objections."
First of all, the Objectants are not disputing that Dr. Lipson did not become incapacitated until September 13, 2013. They concede (reluctantly, using the word "ostensibly" to describe the pledges) the validity of the pledges made before that date.
Secondly, only admissible evidence may be considered on a motion for summary judgment. If third parties exist to whom Dr. Lipson communicated his intent to be solely liable for the pledges, their statements should have been included as part of the opposition. They were not, and such an assertion cannot be considered to defeat summary judgment.
Third, custom and practice would indeed be relevant to Dr. Lipson's intent, however, the only evidence of Dr. Lipson's "custom and practice" is Dawn's self-serving testimony concerning [*8]her conversations with her late husband, which is inadmissible under CPLR 4519 (the "Deadman's Statute). While it has been held, and Dawn argues, that otherwise excludable evidence can be used to defeat summary judgment, that exception has no applicability where "it is the only evidence of the decedent's intent, rendering a trial unnecessary where there will be no waiver of the rule" (see Phillips v Kantor & Co., 31 NY2d at 310[1972]; Marszal v Anderson, 9 AD3d 711, 713 [3d Dept 2004]; Wright v Morning Star Ambulette Servs., Inc., 170 AD3d 1249, 1251 [2nd Dept 2019]; In re Estate of Karas, 193 AD3d 897, 900-901[2nd Dept 2021]; see further 3 Bender's New York Evidence § 146.01
Here, the petitioner has put forward no evidence other than the testimony regarding conversations with the decedent, that he intended his pledges to be paid entirely by him out of Trust money.
Conceivably she could have submitted the checks and other financial information to establish how and from what accounts pledges were paid before Dr. Lipson became incapacitated, but she opposed any discovery regarding her and her husband's finances for the period prior to incapacity. The Objectants having been denied access to that information, it would be patently unfair to allow Dawn to rely on it now to defeat summary judgment. She is estopped from making that argument or relying on that information. 
Thus, Dawn has not raised a material issue of fact as to whether the payments of her one-half obligation out of Trust money were a breach of her fiduciary duty. They were.
Summary judgment is granted to the Objectants on this aspect of the motion.
Disbursements for Income and Property Taxes
Dawn paid property taxes out of Trust money. Since the residence on Clover Hills Drive was titled to Dr. Lipson alone, the taxes were a "valid obligation" and not a joint obligation, and Dawn was within her rights to pay the taxes out of the Trust. Nothing in the Trust agreement makes her responsible for her share of those taxes, even while living there alone. It is undisputed that the home was the marital residence for many years. Summary judgment is denied to the Objectant and granted to the Petitioner.
As for the income taxes, Dawn had no authority under the terms of the Trust to use Trust money to pay her one-half liability of the income taxes, thus the Objectants are entitled to judgment on this issue.
As she argues with respect to the payments on the joint pledges, Dawn asserts it was "custom and practice" for Dr. Lipson to pay the entire amount of income taxes, and that all their income came from assets he had accumulated or earned. No doubt true enough, given the history of Dawn's employment before she married Dr. Lipson, but having contested discovery of their financial records, she cannot now claim reliance on those same records. And her self-serving statements, in the absence of other evidence, such as documentary evidence, to authenticate the content of her conversations with the decedent, are barred by CPLR 4519 (see Phillips v Kantor & Co., 31 NY2d at 310[1972]).
Thus, the Petitioner has not established a material issue of fact with respect to the income tax payments.
Summary judgment is granted to the Objectants.
- Disbursement for Personal and Household Expenses
The Objectants allege that after Dr. Lipson's admission to the Jewish Home in September [*9]2013, and until his death in May 2015, Dawn used $176, 236.58 of trust money to pay "her" household and personal living expenses. The amounts are not disputed, only the characterization.
Money went, among other things, to an addition to the marital residence, maintenance costs for the residence, country club dues, automobile maintenance and payments, and other miscellaneous items.
Objectants contend that Dawn had no authority under the Trust agreement to use Trust money for her personal expenses.
On this issue the Objectants have not established entitlement to judgment as matter of law (with one exception, discussed below).
Nearly every expense relates to the maintenance of the marital residence, which as stated above, Dr. Lipson owned. On their face they were for "valid obligations" in maintaining an asset owned by the Trust, and nothing in the Trust agreement states that she needed to carry her "share" of the expenses because she was living in the residence alone.
The same can be said of the automobile he owned.
Regarding the Irondequoit Country Club dues, the Objectants have not shown that Dr. Lipson did not continue to enjoy his visits there, thus the expenditures were within Dawn's discretion. Yes, he had suffered a devastating stroke and had limited cognition, but it has not been established as a matter of law, giving the petitioner the benefit of every inference, that Dr. Lipson was incapable of enjoying his visits to the country club. He had been a member there for decades.
Dawn testified she would wheel him out in his wheelchair to the veranda at Irondequoit Country Club where he could see the golfers. Apparently, it was Dawn's view that his severe vascular dementia did not prevent him from appreciating the shot making of the golfers.
Here the Trust agreement mandates deference to the discretion of the successor trustee (Section 3, subdivision "b."). The trust agreement allows her to apply "principal" for his benefit, but of course bound by her fiduciary duty to provide for Dr. Lipson's circumstances (she could not, for example, have spent trust money on a solo trip to Cancun). No fact-finding hearing on this issue (which would entail competing neurology testimony) is deemed necessary or even within the court's competence.
As a prior judge of this court has held, "While the avoidance of the expense of a hearing on this less than monumental issue would be an expense that would pale into insignificance to the costs already incurred in this family/estate litigation, nevertheless where summary judgment is called for in the absence of triable issues of fact, it is incumbent on the courts to decide summarily when it can do so appropriately." (Matter of Estate of Birnbaum , 131 Misc 2d 925, 926-27, [Sur Ct Monroe Cnty 1986] citing Andre v. Pomeroy, 35 NY2d 361). Here, in light of what else is being contested, the court deems the country club dues to be an issue of less than "monumental" significance.
The Objectants have not established prima facie that the personal and household expenditures substantially depleted the trust to the detriment of Dr. Lipson's "circumstances." Summary judgment is granted to the petitioner. 
The one exception is the sunroom, on which Dawn spent $68,000 and change. This was not a "valid obligation," as it was incurred unnecessarily after incapacity. She had no authority to expend money or to incur unnecessary debts on something which was not only of questionable value to Dr. Lipson (it seems on its face implausible that the house didn't already have windows in which Dr. Lipson could sit in his wheelchair and catch the sun on those days he was not in the [*10]Jewish Home) but which would benefit her eventually, because the Trust provided for distribution of the house to her. This was not an expenditure authorized by the Trust either as a valid obligation or to provide for Dr. Lipson's welfare and comfort. Under these circumstances the argument that the sunroom was solely for Dr. Lipson's enjoyment is considered incredible a matter of law. 
The Objections relating to household and personal expenses are dismissed except for the expenditure for the sunroom, and on that issue, summary judgment is granted to the Objectants. 
- Disbursements for Pledges Made After Incapacity
As admitted, Dawn made charitable pledges and miscellaneous charitable contributions after Dr. Lipson became incapacitated, the date of which, all agree, was September 13, 2013, at which time he was admitted into the Jewish Home.
The Trust Agreement only provides for gifts by the successor trustee to "lineal descendants" for "estate and tax planning purposes" (Article Four Section 3 [e]). No authorization is given for making gifts to any other persons. Moreover, the Trust Agreement is explicit in stating that the "primary concern" of any gift program shall be "(Dr. Lipson's) welfare and secondarily the welfare of my lineal descendants." The introduction to section (e) is to be read with reference to each of the previous subsections, so that the "welfare" of Dr. Lipson is his financial security and the benefits of any estate tax planning to be afforded by making gifts to the lineal descendants, among whom are the Objectants. 
The intent to restrict the gifting power of the successor trustee is clear and unambiguous, otherwise, Dr. Lipson would have referred to charitable pledges as among the types of gifts that could be made by the successor trustee, since those gifts would have served the same estate tax planning purpose as gifts to lineal descendants. He did not. Thus, in making pledges (and paying them) after Dr. Lipson became incapacitated, she acted beyond her authority and in breach of her fiduciary duty to Dr. Lipson, which (should it need repeating) was to provide for his welfare and circumstances and "secondarily" for the welfare of his lineal descendants.
The Objectants have established entitlement to judgment on this issue.
In opposition Dawn states that Dr. Lipson had expressed his desire for her to make those pledges. Such evidence is barred by the Dead Man's Statue CPLR 4519) and as noted above cannot be used to defeat summary judgment in the absence of any other evidence (s ee Phillips v Kantor & Co., 31 NY2d at 310[1972])
Also, to be highlighted is that Dawn made a charitable contribution after Dr. Lipson's death to Rochester Institute of Technology in the amount of $6000.00 in November 2015, clearly a breach of her fiduciary duty to the distributees of the Trust and nowhere authorized by the Trust Agreement.
Summary judgment on the issue of post-capacity pledges is granted to the Objectants.
Disbursements Made After Dr. Lipson's Death
- Payment to Some Creditors But Not Others
Dawn validly used trust funds to pay creditors — as set forth in Article Five, Section 1(b), she was entitled to use trust funds to pay "legally enforceable claims against me or my Estate." Yet she failed to pay, on an objectively false premise, the $50,000 owed to each of Dr. Lipson's daughters, the Objectants, pursuant to a 1974 separation agreement with Dr. Lipson's first wife [*11]Anita, a clear breach of her fiduciary duty.
No material issue of fact is raised by her contention that she withheld the payment because of a "reservation of rights" by the distributees. Certainly, no legal authority is advanced. The money should have been paid along with other distributions, and failure to do so was a breach of her fiduciary duty as a matter of law.
Summary judgment is granted on this issue. 

- Post-death Distributions
It is not controverted that Dawn made specific distributions under Article Six of the Trust, paying the full amount of some of the distributions - most notably, $1,000,000 to herself - and a nearly full amount of $1,735633.97 to the Rochester Area Community Foundation (out of what was intended to be a $2,000,000 distribution). Nothing of the $125,000 specific bequest was paid to Dr. Lipson's grandchildren. Even if all the prior distributions had been valid, leaving less than three million dollars in the Trust (i.e., not enough to cover the full distribution to Dawn and to the Rochester Area Community Foundation) the payments should have been done ratably (see In re St. George's Estate , 61 Misc 2d 749, 753 [Sur Ct, Nassau Cnty1970]); EPTL 13-1.3[c][4).
Again, judgment on this issue is granted to the Objectants, as the successor true was duty bound to make provisions for the bequests of the grandchildren.
- Time Shares
Pursuant to the explicit provision of the Trust (Article Six, Section 1[g]), Dawn was to make a specific distribution of two time-shares owned by the Trust, one each to Judy Tamblin and elaine Dwyer. She did not and the interests in the time-shares lapsed into foreclosure. She did manage to transfer to herself a third time share that the Trust bequeathed to her.
The Objectants concede that there is a question of fact on this issue, given Dawn's claim that the Objectants told her (or her attorney) that they were not interested in the time-shares.
Summary judgment is denied on this issue.
Other Issues
The court will reserve on the request for attorney's fees and exemplary damages. 
CONCLUSION
Summary judgment is granted to the Objectants on their claims relating to:
-Pledges made before Dr. Lipson became incapacitated and paid after. Petitioner is liable for one-half of the amounts paid.
-Pledges made and paid after he became incapacitated. Petitioner is liable for the entire amount of pledges paid.
 -Income taxes paid. Petitioner is liable for one-half of the amount paid.
 -The expenditure for a sunroom at the house on Clover Hills Drive.
 -Failure to pay $50,000.00 owed to Judi and Elaine pursuant to the Separation [*12]Agreement of 1974.
 -Failure to pay the specific bequests of $125,000.00 to Richard and Marie Tamblin, either wholly or ratably.
Summary judgment is granted to the Petitioner dismissing objections related to:
-Expenditures from the Trust for personal and household expenses (other than the sunroom).
-Payments for property taxes.
The Petitioner has established a material issue of fact as to whether Dawn breached her fiduciary duty in allowing the time-shares to lapse, and a trial will be held on that issue.
The court will reserve on the application for attorney's fees and exemplary damages.
The extent of interest and/or a surcharge on those issues on which judgment was granted will be determined after a hearing.
Dated: January 16th
Rochester, New York
_________________________________
Hon. Christopher S. Ciaccio
Monroe County Surrogate Judge

Footnotes

Footnote 1: None of the transactions at issue here were done under the authority of the grant of Power of Attorney

Footnote 2: The Petitioner, in opposing summary judgment, does not take issue with the characterization of the Objectants as "beneficiaries." Indeed, this Court previously held that once Dawn was appointed successor trustee, the Objectants Judi and Elaine, the "lineal descendants" of Jacques, who had no standing to request an accounting from Jacques, became "permissive discretionary principal beneficiaries" and thus "person interested" with standing pursuant to SCPA 2205(2)(b) to petition for an accounting from the successor trustee

However, it is more accurate to say that they were during Dr. Lipson's life "remainder persons" with a contingent interest in the Trust corpus. Dr. Lipson was the beneficiary, the only beneficiary of the Trust while he was alive, and it was to Dr. Lipson that the successor trustee owed a duty. It is the duty to him that the successor trustee's actions must be measured against. While it is law of the case that the remainder persons are "interested" in the accounting covering the period of Dr. Lipson's incapacity and had standing to compel an accounting for that period, it does not necessarily follow that the successor trustee owed them a "duty" during the life of Dr. Lipson. Nonetheless, without the Objectant's status as interested parties the successor trustee would have been accountable to no one, a situation that one court has held would violate "public policy" ( Matter of Kassover, 124 Misc 2d 630, 631-632 [Sur Ct, Nassau Cnty 2984]). "An essential element of a trust is accountability of the trustee for his administration. Once a valid trust is created accountability must inevitably follow as in incident ( Matter of Kassover, 124 Misc 2d 630, 631-632 [Sur Ct, Nassau Cnty 2984], citing Bogert, Trust & Trustees [2nd Ed] § 973).